FILED

2009 Feb-23  AM 09:22
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

WILLIAM JACKSON,                                              )
                                                             )
      Plaintiff,                                        )
                                                             )
v.                                                           )
                                                             )
UNITED STEEL, PAPER AND FORESTRY, RUBBER,                    )  Civil Action Number:
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL                     )  2:07-cv-461-JEO
AND SERVICE WORKERS INTERNATIONAL UNION,                     )
AFL-CIO-CLC; DISTRICT 9 UNITED STEEL, PAPER                  )
AND FORESTRY, FORESTRY (sic), RUBBER,                        )
MANUFACTURING, ENERGY ALLIED INDUSTRIAL                      )
AND SERVICE WORKERS INTERNATIONAL UNION,                     )
AFL-CIO-CLC; LOCAL UNION NO. 2122 OF UNITED                  )
STEEL, PAPER AND FORESTRY, RUBBER,                           )
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL                     )
AND SERVICE WORKERS INTERNATIONAL UNION,                     )
AFL-CIO-CLC; INTERNATIONAL UNION, AFL-CIO-CLC;               )
DANNY PERRY, in his official and individual capacity;        )
ROBERT ERWIN, in his official and individual capacity;       )
WALTER EVANS, in his official and individual capacity;       )
                                                             )
      Defendants.                                       )

## MEMORANDUM OPINION

In this action, the plaintiff claims that he was wrongfully removed from an elected office

of a local union because of race, in retaliation for engaging in protected expression or activity,

and in violation of union rules and bylaws.  He also claims he was slandered by another member

of the local union.  The cause comes to be heard on three separate motions for summary

judgment filed by the defendants.  One has been filed by the United Steel, Paper and Forestry,

Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union,

AFL-CIO-CLC, and its affiliate, Local Union No. 2122 (the "union defendants" and the "Local"

and the "International") (Doc. 36)[1].  A second motion has been filed by defendant Danny Perry (Doc. 39), and the third and final motion was filed by defendants Walter Evans and Robert Irwin.[2]  (Doc. 42).  The parties have filed evidentiary materials in support of their respective positions (*see* docs. 38, 54, 58, 41, 44), and the motions have been fully briefed.  (*See* docs. 37, 40, 43, 55, 56, 57, 61, 62, 64).  Upon consideration of the record, the submissions of the parties, and the relevant law, the court concludes that each of the respective motions for summary judgment is due to be **GRANTED IN PART AND DENIED IN PART.**

## I.      FACTUAL BACKGROUND[3]

The plaintiff, William Jackson, is African-American.  He is employed by United States Steel Corporation ("U.S. Steel") at its Fairfield Works in Fairfield, Alabama.  The defendant United Steel, Paper and Forestry, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC (the "International") is the collective bargaining representative for the bargaining unit in which the plaintiff is employed.  (Declaration of William League ("League Decl.")[4] ¶ 4).  The plaintiff is a member of an affiliated local union, Local Union No. 2122 (the "Local"), which has approximately 500 members.  (League Decl. ¶ 5).  The Local holds elections every three years to determine leadership positions.  (League Decl. ¶ 6).

_____

[1]References to "Doc(s).___" are to the documents as numbered by the clerk of court in the court's record of the case.

[2]The complaint and many of the documents in this case, including most of those filed on his own behalf, spell the name of this latter individual as Robert "Erwin."  However, it is clear that his name is actually spelled "Irwin."  *See* Deposition of Robert Irwin ("Irwin Dep."), which is Exhibit R to Plaintiff's Evidentiary Submission In Support of His Opposition to the Defendants' Motions for Summary Judgment ("Pl. Evid. Sub."), doc. 54, at 6.

[3]The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only.  They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F. 3d 1386, 1400 (11th Cir. 1994)."  *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp 2d 1266, 1267 n.1 (N.D. Ala 1998).

[4]The declaration of William League with exhibits is Exh. 2 to the Union Defendants Evidentiary Submission in Support of their Motion for Summary Judgment ("Union Dfts. Evid. Sub."), which is doc. 38.

The latest round of such elections was held April 10, 2006, whereupon among the open positions were posts on the Grievance Committee of the Local (the "Grievance Committee").  (*Id.* ¶¶ 6-7). For many years prior to said election, the Grievance Committee had been comprised of three members or "Committeemen."  Each Committeeman represented one of three "areas" of steel production represented by the Local, with each area being comprised of union members working within a line of progression and who have common supervision.  (*Id.* ¶¶ 7-9).  The three areas represented on the Grievance Committee were identified as follows: (1) the "hot strip mill," (2) the "cold mill/Pickle/#5," and (3) the "#4GAL/sheet mill."  (*Id.*; "Election Ballots"[5]). Each of these three Committeeman area posts were up for election in April 2006.  (Election Ballots). Only members employed within the represented area are eligible to vote in its Committeeman race.  (League Decl. ¶ 8).

At the March 2006 monthly meeting of the Local, nominations were made for the leadership positions up for elections in April.  (*See* Minutes from March 13, 2006 Meeting of the Local[6] ("March Meeting Minutes")).  The plaintiff was the sole nominee for Committeeman from the cold mill/Pickle/#5 area, which meant that he was deemed automatically elected to that position.  (League Decl. ¶ 11).  Two individuals, Gene Carden and Mark Bryant, both of whom are white, were nominated to run for Committeeman from the hot strip mill area.  (March Meeting Minutes).  The minutes from the meeting further reflect that a motion was made by William Gunnin "to elect a grievance chairman from the ballot," and that "all approve[d]" it. (*Id.*)  As a result, in addition to the aforementioned Committeeman area races, the April 2006

---

[5]The Election Ballots from the 2006 election are Exh. D to Pl. Evid. Sub.

[6]The minutes of the Local's meeting held March 13, 2006 are Exh. V to Pl. Evid. Sub.

election included a separate space on the ballot for Chairman of the Local's Grievance Committee ("Grievance Chairman"), for which members from all three areas of the Local were eligible to cast votes.  (*See* 2006 Election Ballots).  At the same March meeting, the plaintiff, Carden and Bryant were each nominated as candidates for the position of Grievance Chairman, in addition to running for Committeeman in their respective areas.  (March Meeting Minutes).

A key disputed issue in this case is whether a person was required to win the Committeeman race for his own area in order to be eligible to serve as the Grievance Chairman. This is so because in the April 2006 election, the plaintiff was deemed to win the Committeeman race in his area, and Bryant defeated Carden in the race for Committeeman to represent the hot strip mill area, but in the Grievance Chairman election, Carden received the most votes with 122, followed by the plaintiff with 82 votes, and Bryant with 48 votes.  (League Decl. ¶ 14; Minutes from May 8, 2006 Meeting of the Local ("May Meeting Minutes"), included in materials designated, "Written Protest of Election by Gene Carden, USW 000221-000259" ("Carden Protest File")).[7]  It is undisputed that the Grievance Chairman race was subject to a plurality vote, rather than a majority vote.  Accordingly, the question of whether Carden had to win his area Committeeman race in order to be eligible to serve as the Grievance Chairman would determine whether Carden or the plaintiff was entitled to serve in the latter position.  The long-standing practice of the Local prior to the 2006 nominations and election had been to require its Grievance Chairman to have been also selected as the Grievance Committeeman from his area.  (Deposition

---

[7]The Carden Protest File is Exh. 3 to Union Dfts. Evid. Sub.

of William Gunnin ("Gunnin Dep.")[8] at 18-22; Deposition of Sylvia White ("S. White Dep."[9] at 76-77). This rule appears also to have been followed in connection with the Local's elections in 1996, during a period the Local was under a trusteeship imposed by the International. (Deposition of James Bates ("Bates Dep.")[10] at 35-36). This eligibility requirement was also memorialized in bylaws of the Local that appear to have been drafted no later than 1957. These "1957 Bylaws" provide in relevant part: "The Chairman of the Grievance Committee shall be elected at the same time as officers. He must be elected grievance committman (sic) to qualify for the chairmanship of the Grievance Committee." ("The 1957 Bylaws,"[11] Sec. 4, Art. 2(b)). While it appears that the 1957 Bylaws were an attachment to a filing by the Local with the Secretary of Labor pursuant to the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. §§ 401-531, there is nothing in the record indicating that the 1957 Bylaws were ever approved by the International.

The International has adopted a constitution, which also serves as the constitution for each of its affiliated local unions, including the Local. (*See* Constitution of International Union, United Steel Workers, AFL-CIO-CIC (the "International Constitution" or "Int'l Const.")[12], Art. I). Pursuant to authority granted by the International Constitution, the International has also promulgated standard bylaws that are deemed to have been adopted by each local unless an

---

[8] The deposition of William Gunnin is Exh. I to Pl. Evid. Sub.

[9] The deposition of Sylvia White is Exh. K to Pl. Evid. Sub.

[10] The deposition of James Bates is Exh. G to Pl. Evid. Sub.

[11] The 1957 Bylaws are included in the materials designated, "Bylaws and Constitutional Changes filed with Department of Labor," which is Exh. B to Pl. Evid. Sub.

[12] The International Constitution is Exh. D to the Declaration of Robert A. Rootes ("Rootes Decl."), which, in turn, is Exh. 13 to Union Dfts. Evid. Sub.

individual local has validly adopted its own additional separate bylaws.  (*Id.*, Art. VII, § 5).  The standard bylaws applicable to the Local here are the "By-Laws for Amalgamated Local Unions, United Steelworkers of America" (the "Amalgamated Standard Bylaws" or "Amal. Std. Bylaws").[13]  (*See* "USW's Responses to Plaintiff's Interrogatories,"[14] at 3, ¶ 3).  Under the International Constitution, a local is authorized to adopt its own additional separate bylaws, "subject to approval by the International Union."  (Int'l Const., Art. V, § 5).  The Amalgamated Standard Bylaws further provide that any additional bylaws proposed by a local must be submitted in writing and read at two consecutive local meetings and passed by a two-thirds majority vote of the local membership at the next regular meeting thereafter.  (Amal. Std. Bylaws, Art. XIX, § 3).  Such proposed additional bylaws then "become effective only after approval by the International Union."  (*Id.*)

Under the International Constitution, "[a]ll Local Union Officers and Grievance Committee Members shall be elected ... by a plurality vote of the members participating in a referendum vote."  (Int'l Const., Art. VII, § 8).  A similar requirement appears in the Amalgamated Standard Bylaws.  (Amal. Std. Bylaws, Art. IV, §§ 3(a) & (b)).  The International Constitution also contains a number of provisions that establish qualifications, eligibility requirements, or other limitations upon who may run or serve as an officer or in other positions within a local.  These include a prohibition against nomination, election, appointment, or any office-holding by any one "who is a consistent supporter of, or who actively participates in" a hate-based, racist, or terrorist group (Int'l Const., Art. III, § 3), and requirements that a person

---

[13]The Amalgamated Standard Bylaws are Exh. 8 to Union Dfts. Evid. Sub.

[14]The International's responses to the plaintiff's interrogatories are Exh. X to Pl. Evid. Sub.  This was actually a supplemental exhibit filed with doc. 58.

looking to serve as a "Local Union Officer or Grievance Committee Member" be a member-in-good-standing for the 24-months prior to the election (*id.*, Art. VII, § 9(a)), employed in an enterprise within the jurisdiction of the local (*id.*, Art. VII, § 9(b)), and attend at least one-third of the regular meetings of the local for 24-months prior to the election.  (*id.*, Art. VII, § 10).  These limitations are echoed in the Amalgamated Standard Bylaws.  (*See* Amal. Std. Bylaws Art. III, § 3, §§ 5(a)-(c) (requirements for "Local Union Officer" positions), §§ 6(a)-(c) (requirements for "Unit position" offices))).  The International Constitution and the Amalgamated Standard Bylaws also further limit eligibility by prohibiting a person from being a candidate or holding more than one of several enumerated offices at the same time.  (Int'l Const. Art. VII, § 8; Amal. Std. Bylaws, Art. III, § 2).  However, there is no provision in either the International Constitution or the Amalgamated Standard Bylaws that requires a grievance committee chairman to have won an election as a committeeman from his an area or unit within a local.[15]

Although Carden received the most votes in the April 2006 election among the three candidates appearing on the ballot, the Local's election committee (the "Election Committee") declared and posted that the plaintiff had won the election for Grievance Chairman, based upon the Election Committee's understanding that, as had been the Local's long-standing practice, a

---

[15]In point of fact, neither the International Constitution nor the Amalgamated Standard Bylaws expressly contemplates that a local union will generally have a separate office of grievance committee "chairman" or its equivalent at all.  As stated in the text, the International Constitution refers to "Local Union Officers and Grievance Committee Members," (Int'l Const. Art. VII, § 8), and it further enumerates eight positions (president, vice president, recording secretary, financial secretary, treasurer, guide, guard, and trustee) that are officers of a local, none of which are either a grievance committee member or chairman.  (Int'l Const. Art. VIII, §§ 1- 9).  The Amalgamated Standard Bylaws designate the same "officer" positions (*See* Amal. Std. Bylaws Art. IV, § 1(a)), as well as several additional "Unit Positions," namely, a "Unit President," a "Unit Secretary," and "no less than one ... Unit Griever."  (*Id.*, Art. IV, § 1(b)).  The Amalgamated Standard Bylaws do contain a "note" acknowledging that some locals had previously utilized additional positions, "either elected or appointed," in addition to the officer and unit positions, including, for example, positions referred to as "Business Agent, Business Representative, [or] Chief Grievance Committee Person ... .  (*Id.*, Art. IV, note following § 1(a)).  This note further states, however, that locals "that have had such representatives may continue those positions, subject to the approval of their District Director and of the International President."  (*Id.*)  There is no claim or indication that the Local ever secured such approval here regarding the Grievance Chairman post.

person was eligible to serve as Grievance Chairman only if he won the Committeeman race in his own area, which plaintiff had done but Carden had not.  (*See* Minutes from May 8, 2006 Meeting of the Local ("May Meeting Minutes") and "Results by Election Committee Members" dated April 10, 2006, included in Carden Protest File).  As a result of the Election Committee's ruling, Carden protested at the next meeting in May 2006, claiming that he was entitled to prevail as the candidate receiving the most votes.  (*See* Carden Protest File at 1).  The minutes of that meeting indicate that several members argued about the way the Grievance Chairman was to be elected, and, ultimately, motions passed whereby it was resolved that the Local would send a copy of Carden's protest to the International and they would "let the International work it out and handle the proper protests."  (May Meeting Minutes).  At the next meeting of the Local, on June 12, 2006, the plaintiff was appointed and began serving as the acting Grievance Chairman, pending the outcome of the International's ruling on Carden's protest.  (*See* Plaintiff's Letter to James English dated July 3, 2006, included in Carden Protest File).  Such action appears to be consistent with the provisions of the Local Union Elections Manual, issued by the International to govern local union elections, which states that, after a local union has acted on an election protest, the "Local Union action shall remain in effect unless stayed, set aside or modified by action of the International Executive Board."  ("Local Union Elections Manual, United Steelworkers" ("Elections Manual")[16] at 45).

In the meantime, the International appointed a Commissioner, Morris Anderson, to hear Carden's protest.  (Letter from Leo W. Gerard to Morris Anderson dated June 20, 2006, included in Carden Protest File).  On July 28, 2006, Anderson held a hearing at the Local's union hall, at

---

[16]The Elections Manual is Exh. 9 to Union Dfts. Evid. Sub.

which time Carden, the plaintiff, and others had an opportunity to present evidence regarding the disputed election.  (*See* "Commission Hearing To Investigate ... Election Appeal of Gene Carden" dated August 29, 2006[17] ("Comm'r Hrg. Rpt."); Carden Protest File).  At the conclusion of the hearing, Anderson advised that a he would make a decision and that the protest would be resolved within a couple of months.  (Deposition of Plaintiff William Jackson ("Pl. Dep.")[18] at 66-67).

However, before the International acted further on Carden's protest, the executive board of the Local (the "Local Executive Board") held a meeting in about August 2006 and voted on whether to remove the plaintiff as Grievance Chairman.  (Deposition of Richard Leach ("Leach Dep.") at 28-29, 34-35, 69).  Richard Leach,[19] a trustee of the Local and a member of the Local Executive Board, testified that defendant Robert Irwin, the vice president of the Local and a member of such board, came to the meeting with some otherwise unidentified document or booklet that he said he had obtained from someone at the International that authorized the Local Executive Board to install Carden as Grievance Chairman because Carden had been the incumbent prior to the disputed election.  (*Id.* at 69-73).  It appears that there were approximately

---

[17]The Comm'r Hrg. Rpt. is Exh. M to Pl. Evid. Sub.

[18]The Plaintiff's Deposition is Exh. 1 to Union Dfts. Evid. Sub.

[19]The defendants have filed two motions in limine that sought to exclude testimony from Leach, as well as from several other witnesses.  (*See* Dfts. Mot. in Limine to Excl. Testimony of Witnesses Not Timely Disclosed, Doc. 45; Dfts. Mot. in Limine to Excl. Testimony of Dr. Sandra Grooms, Doc. 47).  However, the defendants have withdrawn their objection to Leach (Dfts. Reply in Support of Mot. in Limine, Doc. 65).  The only other witness that is both a subject of the defendants' motions in limine and from whom testimony is offered by the plaintiff in opposition to the motions for summary judgment is Clarence Pope.  (*See* Clarence Pope Decl., included in Exh. L to Pl. Evid. Sub., Doc. 54).  Pope's testimony is limited to a brief declaration in which he makes statements regarding the eligibility requirements for the Grievance Chairman office observed during an election at the Local in 1996, during a period that it was under the control of a trustee installed by the International.  (*Id.*)  However, other witnesses have also testified regarding those same events without objection.  (*See* Bates Dep. at 35-36).  Accordingly, whether or not Pope's declaration is now considered has no bearing on the outcome of the defendants' motions for summary judgment, and it is not necessary to resolve either of the defendants' motions in limine at this time.  Rather, it is more appropriate to reserve ruling on the motions in limine until closer to trial.

ten members of the Local Executive Board, comprised of all officers of the Local except the

president, and that they were all present for the vote.  (*Id.* at 71-73).  This would have included

defendants Irwin; Danny Perry, a trustee; and Walter Evans, the recording secretary.  And while

the breakdown of yeas and nays is not in the record, a majority of the Executive Board members

passed a motion to remove the plaintiff and install Carden.  (Leach Dep. at 73-74).  Pursuant to

that vote of the Local Executive Board, at the August 14, 2006 meeting of the Local, the plaintiff

was removed from office and Carden was sworn in as his replacement, without a vote of the

membership.  (Leach Dep. 29, 69-70; Pl. Dep. 27-28, 73-74).

On August 22, 2006, Jackson filed a complaint with the Secretary of Labor (the

"Secretary") asserting violations of his rights under the Labor-Management Reporting and

Disclosure Act of 1959, 29 U.S.C. §§ 401-531 ("LMRDA").  (*See* letter from Ronald G. Elmore,

District Director, Office of Labor-Management Standards, to Plaintiff William Jackson, dated

August 24, 2006 ("OLMS Letter"), included in materials designated, "Complaints and Decisions

of Department of Labor, NLRB, and EEOC"[20] ("Gov't Correspondence")).  The plaintiff

received an immediate response from the Office of Labor-Management Standards ("OLMS") on

behalf of the Secretary, who is charged with enforcing Title IV of the LMRDA, §§ 401-403, 29

U.S.C. §§ 481-483 ("Title IV"), stating that no action would be taken.  (*Id.*)  The letter explained

that the Secretary had no jurisdiction with respect the plaintiff's Title IV claims because such

provisions govern elections only with regard to union "officers," and the Grievance Chairman

position did not fall within that term as defined by the Act.  (*Id.*)  The letter further stated that the

Secretary would not act upon his claims asserting violation of his rights under Title I of the

---

[20]The OLMS Letter and the other materials in the Gov't Correspondence are at Exh. A to Pl. Evid. Sub.

LMRDA on the ground that such provisions may only be enforced by union members through private suits in federal court.  (*Id.*)

On or about August 29, 2006, Anderson issued his commissioner's hearing report to the International's Executive Board Appeal Panel (the "International Appeal Panel").  (Comm'r Hrg. Rpt.).  Therein, Anderson recommended that Carden's appeal be denied and that the plaintiff be awarded the Grievance Chair.  (*Id.*)  Anderson indicated therein that he had been persuaded by "some old By-Laws [of the Local] which stated clearly that the winner of the Grievance Chairman position would have to have won the Grievance Committeeman job in their own area," and by the testimony of Gunnin and other witnesses stating that such had indeed been the Local's practice for many years.  (*Id.* at 3).

On October 26, 2006, the full International Appeal Panel met to consider Carden's protest.  (*See* Letter from Thomas Conway to Gene Carden dated November 2, 2006 (the "Conway Letter"), with attachments).[21]  The International Appeal Panel rejected Anderson's commissioner report and recommendation and instead upheld Carden's appeal.  (*Id.*)  The record evidences a summary of the decision of the International Appeal Panel on Carden's protest, as follows:

> "The appellant protested the election because, based on an interpretation of an old bylaw, the election committee ruled that [the plaintiff] won the Grievance Chairman position even though Brother Carden received the most votes.  The protest was denied by the Commission membership.
>
> "The Commission found that there was testimony that the local union had voted prior to the election to elect the Grievance Chairperson by whomever received the majority of votes.  However, the local president produced an old bylaw that states that in order to win the position of Grievance Chairperson, you

---

[21] The Conway Letter with attachments is Exh. 4 to Union Dfts. Evid. Sub.

must win the Grievance Committee position in your area.  Testimony was given that indicated that this had been the practice for years.  The commission recommends that the Teller's Report be upheld and the appeal be denied.

"The Appeal Panel found that there was evidence that the membership had voted to have the person receiving the most votes installed as Grievance Chair, regardless of the other grievance positions.  Further, the panel found that the bylaws relied upon by the Commission had never been approved by the International Union.

"The appeal of Gene Carden is granted.  He is to be installed as the Grievance Chairperson and the local union will now have four local members of the Grievance Committee."

(*See* Deposition of Thomas Conway ("Conway Dep.")[22]; "104th Meeting of the International Executive Board Appeal Panel Summary of Cases"[23]).  In a letter to Carden dated November 2, 2006, the Appeal Panel's Chairman, Thomas Conway, stated as follows:

Please be advised that the International Executive Board Appeal Panel of the United Steelworkers at its meeting in Pittsburgh, PA on October 26, 2006, did **not** adopt the report and recommendation of the International Commission in the [appeal of Gene Carden].

The International Executive Board Appeal Panel found that there was clear evidence that the membership had voted to elect the Grievance Committee Chair by whoever received the most votes.  The evidence is also clear that Gene Cardin did receive the most votes for this position.

The Appeal Panel also found that the Local Union By-Laws that were relied upon the Local Union President and the International Commission are not on file as being approved by the International Union.

The Appeal Panel finds the appeal of Gene Cardin (sic) is upheld.  He received the most votes from the membership and is therefore the properly elected Chair of the Grievance Committee and should be installed in that position immediately.  The Grievance Committee of [the Local] shall now consist of four (4) elected members.

---

[22]The Deposition of Thomas Conway is Exh. S to Pl. Evid. Sub.

[23]The document "104th Meeting of the International Executive Board Appeal Panel Summary of Cases" is Exh. 5 to Union Dfts. Evid. Sub.

(Conway Letter (emphasis original)).  At its meeting on December 18-20, 2006, the International

Executive Board passed a motion to formally approve the report of the International Appeal

Panel upholding Carden's protest.   (*See* Conway Letter with attachments).

The plaintiff later filed a charge against the International and the Local with the National

Labor Relations Board ("NLRB"), alleging that his removal from office as Grievance Chairman

was arbitrary, invidious, and unfair, in violation of the National Labor Relations Act of 1947, 29

U.S.C. §§ 151-169 ("NLRA"), specifically Section 8 thereof, 29 U.S.C. § 158.  (*See* Gov't

Correspondence).  The Region Office of the NLRB replied stating that, after investigation, "there

is insufficient evidence of a violation and further proceedings are not warranted at this time, as

the internal disputes over the election of local union grievance chairman and other local officers

is outside the jurisdiction of the [NLRA]."  (*Id.*)  Accordingly, the plaintiff's charge was

dismissed.  (*Id.*)

The plaintiff also filed a charge of discrimination with the Equal Employment

Opportunity Commission ("EEOC"), asserting that the union had denied him his right to fill the

Grievance Chairman position to which he was elected, and that such had been done because of

race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§  2000e

to 2000e-17 ("Title VII").  (*See* Gov't. Correspondence).  The same day the charge was filed, it

was dismissed by the EEOC on the basis that it had determined that "[t]he facts alleged in the

charge fail to state a claim under any of the statutes enforced by the EEOC."  (*Id.*)

The plaintiff also claims that during the period that he was on the Grievance Committee,

defendant Danny Perry made several allegedly defamatory statements about him.  More

specifically, Leach testified that Perry allegedly made statements to other union members prior to

13

one or more meetings to the effect that the plaintiff was "a racist" and "a radical" "because he would only stand up for black people" as a grievance committee member.  (Leach Dep. at 24-25). Leach also testified about another conversation in which Perry allegedly made statements that the plaintiff was "suspected" of "misusing funds" by "taking off on Union business too often and using up Union funds."  (Leach Dep. at 30-31).  Randall Harris, a co-worker of the plaintiff's, testified that Perry told him once that the plaintiff "was being audited and being investigated on being out on union business, getting paid by the union when he wasn't doing union business and he was out on five day subject to discharge while they was (sic) doing the investigation." (Deposition of Randall Harris[24] ("Harris Dep.") at 27-32).  Finally, Demetrius Reynolds, an employee who worked with the plaintiff in the cold reduction area of the plant, testified to a similar conversation in which Perry allegedly said that he had done "some kind of audit" and found that the plaintiff and several other union officials "were basically robbing" the union by claiming to "tak[e] off work on union business," and being paid by the union for such lost time but without actually conducting union business.  (Deposition of Demetrius Reynolds ("Reynolds Dep.")[25], at 26-31).

In his eight-count complaint in this court, the plaintiff has named as defendants the International, "District 9" of the International, the Local, as well as Perry, Irwin, and Evans in both their official and individual capacities.  (Compl.)  In Count I, Jackson asserts claims alleging violations of the LMRDA.  (*Id.*, ¶¶ 31-39)  More specifically, he says that the defendants engaged in a variety of actions, including removing him from the Chairman position,

---

[24]The deposition of Randall Harris is Exh. 3 to the Evidentiary Submission in Support of the Motion for Summary Judgment of Danny Perry ("Dft. Perry Evid. Sub."), which is Doc. 41.

[25]The deposition of Demetrius Reynolds is Exh. 2 to Dft. Perry Evid. Sub.

changing election qualifications and procedures after the election, and failing to follow election

and qualification procedures as established by the CBA and union rules and by-laws, that

violated both Title I and Title IV of the Act.  (*Id.*)  In Count II, Jackson brings claims for breach

of a union's duty of fair representation.  (*Id.*, ¶ 40-48).   He further alleges in that count that "the

defendants violated the plaintiff's rights under the collective bargaining agreement, [the] union's

bylaws and [the] union's constitution."  (*Id.*, ¶ 47).  Count III asserts additional claims under both

Title I and § 609 of Title VI of the LMRDA ("Title VI"), 29 U.S.C. § 529, based upon

allegations that the plaintiff was wrongfully removed from office as discipline for exercising

freedoms of speech and assembly protected by that Act.  (Compl., ¶¶ 49-56).  Count IV contains

claims alleging that the defendants removed him from the Chairman position because of his race,

in violation of Title VII and 42 U.S.C. § 1981 ("§ 1981").  (*Id.*, ¶¶ 57-64).  In Count V, Jackson

asserts that the defendants subjected him to retaliation in violation of both Title VII and § 1981.

(*Id.*, ¶¶ 65-73).  Count VI asserts additional claims of discrimination under § 1981.  (*Id.*, ¶¶ 74-

79).  And finally, Count VII maintains that defendant Perry committed slander and libel by

making false statements to Jackson's co-workers that Jackson had stolen money from the union,

that a union investigation had found that Jackson had stolen money from the union, and that

Jackson had refused to file grievances on behalf of white union members.  (Compl., ¶¶ 81-90).

Based on the foregoing claims, Jackson seeks for the court to grant relief that includes an award

of compensatory and punitive damages, attorney fees and costs; a declaratory judgment stating

that Jackson's removal from the Chairman position was "null and void"; and an injunction

directing the defendants to "cancel and expunge" their actions changing election and

qualification procedures and restraining them from making such changes in the future except as

provided by the union's rules and regulations.  (*Id.*, *Ad damnum* clause following ¶ 90).

Following the completion of discovery, the defendants filed their instant motions for summary

judgment.

### III.    SUMMARY JUDGMENT STANDARDS AND BURDENS

Summary judgment is to be granted if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the declarations, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." FED. R. CIV. P. 56(c).  The substantive law will identify which facts are material

and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A factual

dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.'" *United States v. Four Parcels of Real Property in Greene and Tuscaloosa*

*Counties in the State of Alabama*, 941 F.2d 1428, 1437 (11th Cir. 1991) ("*Four Parcels*")

(quoting *Anderson*, 477 U.S. at 248, 251-52).

> The party moving for summary judgment
>
> bears the initial burden to show the district court, by reference to materials on file,
> that there are no genuine issues of material fact that should be decided at trial.
> Only when that burden has been met does the burden shift to the nonmoving party
> to demonstrate that there is indeed a material issue of fact that precludes summary
> judgment.

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Celotex Corp. v.*

*Catrett*, 477 U.S. 317 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Where the

movant for summary judgment will not bear the burden of proof on a claim or issue at trial, the

movant can satisfy this initial burden of production at summary judgment by pointing to specific

portions of the record materials on file that either negate an essential element of the non-

movant's claim or that affirmatively indicate "that the party bearing the burden of proof at trial will not be able to meet that burden." *Clark*, 929 F.2d at 608; *see also Four Parcels*, 941 F.2d at 1438 & n.19.  However, "it is never enough simply to state that the non-moving party cannot meet its burden at trial," *id.*, or to make "a conclusory assertion that the plaintiff has no evidence to prove his case." *Four Parcels*, 941 F.2d at 1438 n.19 (quoting *Celotex*, 477 U.S. at 328 (White, J., concurring)).

Once the moving party has met its burden, Rule 56(e), FED. R. CIV. P.,  "requires the nonmoving party to go beyond the pleadings and by affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324.  The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*  "[T]he judge's function is not himself to weight the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Accordingly, in its review of the evidence, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor.  *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).  But, if after sufficient time for discovery, the nonmoving party's evidence fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof [at trial]," *Celotex*, 477 U.S. at 323, the moving party is entitled to summary judgment.

17

IV.     **ANALYSIS**

 A. **Title IV of the LMRDA and Subject-Matter Jurisdiction Over**
  **All Claims Against the Union Defendants**

  The union defendants[26] argue that they are entitled to summary judgment on the theory

that this court lacks subject-matter jurisdiction to hear the claims that the plaintiff asserts against

them because such claims, the defendants contend, are barred by the exclusivity-of-remedy

provisions contained in Title IV of the LMRDA.  The union defendants posit that the

"fundamental issue in this case is whether [Jackson] was elected to be Chairman of the

Grievance Committee" and that if he was not, "all of his claims necessarily fail."  (*See*

Memorandum in Support of Motion for Summary Judgment of USW and USW Local 2122[27]

("Union Dft's Summ. J. Brief") at 11).  The union defendants maintain further that, pursuant to

29 U.S.C. §§ 482 and 483, this court is without jurisdiction to determine whether or not Jackson

was so elected because, they say, "the exclusive remedy for resolution of disputed union

elections is by complaint to the Secretary of Labor."  (*Id.*)

  Resolution of the union defendants' argument requires an understanding of the

background and structure of the LMRDA, particularly the scope of rights afforded by Title I and

Title IV of the LMRDA, as well as the respective schemes by which such rights are enforceable.

The LMRDA "was Congress' first major attempt to regulate the internal affairs of labor unions,"

---

  [26]The court notes that one of the defendants listed in the complaint is "District 9" of the International, which is the district encompassing southeast region containing the Local.  It does not appear that a motion for summary judgment has been filed formally on behalf of the "District 9" defendant.  However, the plaintiff has acknowledged that employees of the District 9 defendant are actually employees of the International.  (Memorandum in Support of Plaintiff's Opposition to the Motion for Summary (sic) of USW and Local 2122 ("Pl. Brief Opp. Union Dfts. Summ. J. Mot."), doc. 51, at 2, ¶ 5).  Further, the plaintiff has not identified any alleged wrongdoing by District 9 specifically.  Accordingly, the court concludes that the plaintiff's claims against the District 9 defendant will rise or fall with the claims against the International.

  [27]The Union Dfts. Summ. J. Brief is doc. 37.

*Local No. 82, Furniture and Piano Moving, Furniture Store Drivers, Helpers, Warehousemen and Packers v. Crowley*, 467 U.S. 526, 528 (1984), and was "'the product of congressional concern with widespread abuses of power by union leadership.'"  *Id.* at 536 (quoting *Finnegan v. Leu*, 456 U.S. 431, 435 (1982)); *see also Dolan v. Transport Workers Union of America*, 746 F.2d 733, 739 (11th Cir. 1984).  The legislation had the "primary objective of ensuring that unions would be democratically governed and responsive to the will of their memberships." *Finnegan*, 456 U.S. at 435-36 (citation omitted).

Title I of the LMRDA, §§ 101-105 of the Act, 29 U.S.C. §§ 411-415, contains a "Bill of Rights of Members of Labor Organizations."  *See* § 101 of the Act, 29 U.S.C. § 411.  These provisions are "designed to guarantee every union member equal rights to vote and otherwise participate in union decisions, freedom from unreasonable restrictions on speech and assembly, and protection from improper discipline."  *Crowley*, 467 U.S. at 536-37 (citing *Finnegan*, 456 U.S. at 435-36; *Steelworkers v. Sadlowski*, 457 U.S. 102, 103, 109-110 (1982)).  "Given these purposes, there can be no doubt that the protections afforded by Title I extend to union members while they participate in union elections."  *Id.*, 467 U.S. at 537; *see also Sadlowski*, 457 U.S. at 112.  Under § 102 of the Act, Title I rights are enforceable through private suits filed directly by individual union members in the federal district courts, which are authorized to grant "such relief (including injunctions) as may be appropriate."  29 U.S.C. § 412.[28]

"Title IV of the LMRDA[, §§ 401-403, 29 U.S.C. §§ 481-483,] specifically regulates the

_____

[28]Section 102 of the LMRDA provides in its entirety as follows:  "Any person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate." 29 U.S.C. § 412.  "Standing by itself, this jurisdictional provision suggests that individual union members may properly maintain a Title I suit whenever rights guaranteed by that Title have been violated.  At the same time, however, § 102 explicitly limits the relief that may be ordered by a district court to that which is 'appropriate' to any given situation. *See Hall v. Cole*, 412 U.S. 1, 10-11 (1973))."  *Crowley*, 467 U.S. at 538 (footnote omitted).

conduct of elections for union officers, and therefore protects many of the same rights as does

Title I." *Crowley*, 467 U.S. at 539; *see also Calhoon v. Harvey*, 379 U.S. 134, 141 (1964) ("In

part, both [Title I and Title IV] seem to deal with the same subject matter....  (Stewart, J.,

concurring)).  The Supreme Court has summarized Title IV as

> set[ting] up a statutory scheme governing the election of union officers, fixing the
> terms during which they hold office, requiring that elections be by secret ballot,
> regulating the handling of campaign literature, requiring a reasonable opportunity
> for the nomination of candidates, authorizing unions to fix 'reasonable
> qualifications uniformly imposed' for candidates, and attempting to guarantee fair
> union elections in which all the members are allowed to participate.

*Calhoon,* 379 U.S. at 140.  However, unlike Title I, Title IV generally does not allow private

suits to remedy alleged violations of its substantive provisions.[29]  Rather, enforcement of Title IV

rights is by the following procedure:

> Any union member who alleges a violation [of Title IV] may initiate the
> enforcement procedure.  He must first exhaust any internal remedies available
> under the constitution and bylaws of his union.  Then he may file a complaint with
> the Secretary of Labor, who 'shall investigate' the complaint.  Finally, if the
> Secretary finds probable cause to believe a violation has occurred, he 'shall ...
> bring a civil action against the labor organization' in federal district court, to set
> aside the election if it has already been held, and to direct and supervise a new
> election.

*Trbovich v. Mine Workers*, 404 U.S. 528, 531 (1972) (quoting § 402 of the Act, 29 U.S.C. §

482); *see also Calhoon*, 379 U.S. at 140.  If the Secretary declines to file a Title IV enforcement

action, that decision is subject to judicial review, but limited only to an examination of the

Secretary's "reasons statement" to determine whether the Secretary's decision was arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law.  *Dunlop v.*

---

[29]The only exception to the rule against private enforcement suits regarding Title IV rights is set forth in § 401(c) of
the LMRDA, which allows any bona-fide candidate for a covered union office to file a private suit in federal court to enforce
rights relative to the distribution of campaign literature and equal access to membership lists.  29 U.S.C. § 481(c); *see also Mims
v. Teamsters Local No. 728*, 821 F.2d 1568 (11th Cir. 1987).  This exception is not applicable here.

*Bachowski*, 421 U.S. 560, 565 (1975), *overruled on other grounds*, *Crowley*, 467 U.S. at 549

n.22; *see also Stapleton v. United Transp. Union*, 807 F. Supp. 1543, 1544-45 (M.D. Ga. 1992).

Congress also included in Title IV an exclusivity provision that explains the relationship between

the enforcement procedures established for violations of Title IV and the remedies available for

violations of potentially overlapping state and federal laws.  In relevant part, § 403 of the

LMRDA provides:

> "Existing rights and remedies to enforce the constitution and bylaws of a labor
> organization with respect to elections prior to the conduct thereof shall not be
> affected by the provisions of this title. The remedy provided by this title for
> challenging an election already conducted shall be exclusive." 73 Stat. 534, 29
> U.S.C. § 483.

*Crowley*, 467 U.S. at 539-40.  Relying on this provision, the Supreme Court has held that Title

IV "'sets up an exclusive method for protecting Title IV rights,' and that Congress 'decided not

to permit individuals to block or delay union elections by filing federal-court suits for violations

of Title IV.' " *Crowley,* 467 U.S. at 540 (quoting *Calhoon,* 379 U.S. at 140).

The union defendants are correct to the extent they contend that this court lacks subject-

matter jurisdiction to consider claims alleging violations of Title IV of the LMRDA.  The

plaintiff's exclusive method for vindicating his Title IV rights was to file a complaint with the

Secretary of Labor, who, in turn, has sole authority to bring a judicial enforcement action.  *See*

*Crowley*, 467 U.S. at 540; *Calhoon*, 379 U.S. at 140; *Mims v. Teamsters Local No. 728*, 821 F.2d

1568, 1571 (11th Cir. 1987).  The plaintiff did file a complaint with the Secretary of Labor, but

the Secretary declined to pursue an enforcement action.  The Secretary's decision was subject to

judicial review, but Jackson has not named the Secretary as a party to this action or otherwise

sought such review here, and this court cannot entertain the plaintiff's claims directly alleging

violations of Title IV.  Because this court lacks subject-matter jurisdiction over Jackson's Title

IV claims, they are due to be dismissed without prejudice.  *See Georgia Advocacy Office, Inc. v.*

*Camp*, 172 F.3d 1294, 1299 (11th Cir. 1999).

The union defendants urge, however, that Title IV's exclusivity provision precludes an

exercise of jurisdiction with respect to *any* of the claims against them, including any claims

under Title I of the LMRDA, the NLRA, the LMRA, Title VII of the Civil Rights Act, and 42

U.S.C. § 1981.  The union defendants characterize all of Jackson's claims as being, in substance,

post-election challenges to the validity of an internal union determination that Jackson did not, in

fact, win the race for the Chairman position, and the union defendants assert that  "Congress

vested the Secretary of Labor with the *exclusive authority* to challenge the results of a union

election."  (Union Dfts. Summ. J. Brief at 12 (emphasis original)).  As such, the union defendants

maintain, all of the plaintiff's claims are effectively preempted by Title IV's exclusivity-of-

remedy provision.

Even assuming that the exclusivity-of-remedy provision in Title IV has the potential to

limit Jackson's pursuit of the other statutory causes of action he has advanced, the union

defendants' argument is still due to be rejected.  Contrary to the defendants' assertions, Title IV

does not govern all "internal union elections" generally or "disputes" regarding same.  Rather,

Title IV establishes requirements, rights, and remedies only with respect to elections of union

"officers."  29 U.S.C. § 481; *see also Turner v. Dempster*, 743 F.2d 1301, 1303 (9th Cir. 1984)

("Title IV has no language referring to elections, other than the election of officers."); *see also*

*Perreault v. Local 509, Intern. Union of Electronic, Electrical, Technical, Salaried, and Machine*

*Workers, AFL-CIO*, 823 F.2d 35, 37 (2d Cir. 1987); *Brown v. Sombrotto*, 523 F. Supp. 127, 130

22

(S.D.N.Y. 1981).  Further, where a contested union election does not involve a post that qualifies

as an "officer" within the meaning of the LMRDA, Title IV does not apply, so Title I claims

related to the election are not barred by Title IV's exclusivity-of-remedy provision.  *Knisley v.*

*Teamsters Local 654*, 844 F.2d 387, 391 (6th Cir.1988); *Fiori v. Truck Drivers Union Local 170*,

130 F. Supp. 2d 150, 155 (D. Mass. 2001).  This same principle would apply *a fortiori* to claims

that are not founded upon any provision of the LMRDA.  Accordingly, if the position of the

Grievance Chairman position is not an "officer" under the LMRDA, Title IV's exclusive remedy

provision cannot preclude any of the claims that arise outside of Title IV.

The union defendants contend that the Grievance Chairman position is an officer under

the LMRDA and that Title IV's exclusivity-of-remedy provision therefore bars all claims.  The

term "officer" is specifically defined by § 3(n) of the LMRDA as follows:

> "Officer" means any constitutional officer, any person authorized to perform the
> functions of president, vice president, secretary, treasurer, or other executive
> functions of a labor organization, and any member of its executive board or
> similar governing body.

29 U.S.C. § 402(n).  In addition, the Secretary has promulgated regulations that flesh out the

definition of who is a union "officer" covered by Title IV.  *See* 29 C.F.R. §§ 452.17 to 452.22.

However, as the plaintiff argues, this case implicates considerations beyond simply the relevant

statutory and regulatory definitional provisions.  Namely, the plaintiff filed a complaint with the

Secretary alleging violations of Title IV, but she declined to act based upon her determination

that she lacked jurisdiction to pursue Title IV violations regarding the election because the

Grievance Chairman position was not an officer for purposes of the LMRDA.  The union

defendants maintain that the Secretary was simply wrong and that the plaintiff still cannot bring a

23

direct Title I action where Title IV applies.  They say that the plaintiff's sole remedy was to sue the Secretary to compel her to pursue a Title IV enforcement action.  The plaintiff, on the other hand, argues that this court can hear claims insofar as they arise under Title I or other federal statutes because the Secretary has held that Title IV does not apply, based on her determination that the Grievance Chairman is not an officer.

Where the Secretary has found that a disputed union position election is not covered by Title IV, some courts appear to treat such a determination as conclusive for purposes of whether they may hear related Title I claims.  *See Knisley*, 844 F.2d at 391, *Fiori*, 130 F. Supp. 2d at 155.  At least one other court, the Second Circuit, has held that such a determination by the Secretary is entitled to "considerable deference."  *Perreault,* 823 F.2d at 37.   This court finds that a high degree of deference is owed to the Secretary's determination in this context, even if it is not deemed conclusive.  While the union defendants assert that the plaintiff's only remedy was to sue the Secretary, in any such suit, the Secretary's determination regarding the applicability of Title IV to the election might be set aside only if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law  *See Harrington v. Chao*, 372 F.3d 52, 60-63 (1st Cir. 2004); *Petersen v. Dole*, 956 F.2d 1219, 1221 (D.C. Cir. 1992).  If this court were to reject the Secretary's determination regarding the scope of Title IV to the plaintiff's claims based upon a degree of deference less than that specified in *Dunlop v. Bachowski*, the plaintiff would be unfairly subject to a "whip-saw" effect depriving him of Title I rights and remedies to the extent that they would be otherwise available.  *See Knisley*, 844 F.2d at 391.

Ultimately, whether the Secretary's determination that the Chairman position is not an

officer for purposes of Title IV is actually conclusive is a question this court need not decide.[30]

For even if it is not conclusive, the Secretary's determination has not been shown to be arbitrary

and capricious.  The union defendants argue that the Chairman position is "an important one"

and that it is "perceived as a powerful position with executive power."  (Defendants USW

International Union, USW District 9, and USW Local 2122's Reply to Plaintiff's Response to

Motion for Summary Judgment[31] ("Union Dfts. Summ. J. Reply") at 5).  In support, however,

they point only to the fact that one witnesses, Betty Bryant, testified that, in her opinion, the

Chairman of the Grievance Committee is "more powerful" than the president or vice-president of

the Local Union.  (*Id.,* at 5-6 (citing Deposition of Betty Bryant[32] ("Bryant Dep.") at 76-78.  The

issue here, however, is not whether the position is "important" or "powerful" in Bryant's

estimation; the question is whether the *Secretary*'s estimation that the position was *not* an

"officer" under § 402(n) was arbitrary or capricious.  The answer to that latter question is clearly

"no."  The International Constitution and the Amalgamated Standard Bylaws both enumerate the

positions that qualify as an "officer" of an affiliated local union in the absence of a valid local

bylaw stating otherwise.  (*See* Int'l Const. Art. VIII, §§ 1-9; Amal. Std. Bylaws Art. IV, §§ 1(a)

& (b)).  None of those enumerated positions are either a grievance committee member or

chairman.  (*Id.*)  Likewise, the Elections Manual promulgated by the International expressly

states, "A Grievance Committee Member is not considered a Local Union Officer...."  (Elections

---

[30]If the Secretary's determination that a union election was not covered by Title IV is treated as *conclusive* in a
subsequent Title I suit, there is little to no incentive for a plaintiff to seek judicial review of the Secretary's determination, even if
arbitrary and capricious.  Arguably, even where the Secretary expressly declines jurisdiction, allowing a plaintiff to bring claims
in a private suit under Title I where they are clearly and rightfully covered by Title IV undermines the scheme that Congress
established whereby only the Secretary has authority to enforce claims within the scope of Title IV.

[31]The Union Dfts. Summ. J. Reply is doc. 62.

[32]The deposition of Betty Bryant is Exh. E to Pl. Evid. Sub.

Manual, Sec. II, p. 17).  Rather, the Amalgamated Standard Bylaws classify "Unit Grievers" or

"Grievance Committee Members" as "Unit Positions" that are "[i]n addition to the Local Union

Officers identified" above.  (Amal. Std. Bylaws § 1(b) & n.6).  The fact that the union

constitution and applicable bylaws do not designate "Unit Grievers," "Grievance Committee

Members," or the Grievance Chairman as "officers," while not dispositive, is relevant to the

inquiry.  *See* 29 C.F.R. § 452.18;[33] *also compare Wirz v. National Maritime Union of Amer.*, 399

F.2d 544, 551-52 (2d Cir. 1968) (holding in enforcement action brought by the Secretary that,

where union constitution expressly identified "patrolmen" as "officers," district court correctly

concluded they were officers under Title IV), *with Perreault*, 823 F.2d at 36-37 (distinguishing

*Wirz v. National Maritime, supra*, in a private action brought by a union member, upholding the

Secretary's decision that a "Zone Committeeman" was not an "officer" under Title IV where

position was not listed as an officer in union's constitution).  Where a position is not identified as

an officer in the union's constitution or other organic union law, a person holding the office may

still qualify as an officer for purposes of the LMRDA  if he is entitled to perform or actually

---

[33]29 C.F.R. § 452.18 provides:

A constitutional officer refers to a person holding a position identified as an officer by the constitution and bylaws of the labor organization.  Thus, for example, a legislative representative of a labor organization who performs no executive functions and whose duties are confined to promoting the interests of members in legislative matters is nevertheless an officer who is required to be elected where the labor organization's constitution identifies the holder of such a position as an officer. On the other hand, legislative representatives who are required to be elected by the constitution and bylaws of a labor organization are not considered to be officers within the meaning of the Act if they are not designated as such by the constitution, are not members of any executive board or similar governing body, and do not perform executive functions. As defined in the Act, however, the term "officer" is not limited to individuals in positions identified as such or provided for in the constitution or other organic law of the labor organization.  The post of Honorary President, President Emeritus or Past President that is to be assumed by the retiring chief executive officer of a union would not be an officer position unless it is designated as an officer position by the union's constitution, or the holder of the position performs executive functions or serves on an executive board or similar governing body.

(footnote omitted).

26

performs executive functions or serves on an executive board or similar governing body.  *See* 29

C.F.R. §§ 452.18 to 452.20.  Accordingly, "[i]n determining whether a particular union official

is an 'officer within the meaning of the LMRDA, the functions performed by that individual are

to be examined."  *Marshall v. Local Lodge 1784, Intern. Ass'n of Machinists and Aerospace*

*Workers, AFL-CIO*, 509 F. Supp. 90, 95 (D. Md. 1981).  The Amalgamated Standard Bylaws

state that the duties of "Unit Griever(s)" are "to process complaints and grievances, within their

respective Units and in accordance with the appropriate [CBA] and, consistent with these By-

Laws and the Manuals, policies and Constitution of the International Union to perform such other

duties as the Unit or the Local Union may assign."  (Amal. Std. Bylaws Art. V, § 9(c)).  Such a

description suggests that members of the Grievance Committee fulfill primarily an adjudicatory

or administrative function pertaining to the processing and resolution of individual employee

grievance complaints, rather than executive, governing, or broader policymaking authority.  As

such, the record fails to demonstrate that the Secretary's determination that the Grievance

Chairman position was not an officer for purposes of Title IV was arbitrary or capricious.  *See*

*Perreault*, 823 F.2d at 37 (upholding the Secretary's determination that a "Zoneman" was not an

officer under Title IV where he was not identified as an officer in the union's constitution, the

position "provide[d] for the funneling of employee grievances," and the officeholder did not sit

on the union's executive board or set policy for the union); *Marshall v. Local 1010, United*

*Steelworkers of America, AFL-CIO, CLC*, 664 F.2d 144, 151-52 (7th Cir. 1981) (suggesting that

"the position of vice-chairman of the grievance committee is not an 'officer' within the

LMRDA's definition").

      In their reply brief, the union defendants respond, however, that Jackson is due to be

judicially estopped from arguing that the Grievance Chairman position is not an "officer" under

the LMRDA or that his claims are not subject to Title IV.  They argue that his complaint alleges

that Title IV applied to the election for the Chairman position and that he sought to recover for

alleged violations of Title IV.  Accordingly, the union defendants argue, Jackson should not be

permitted now to take the inconsistent position that Title IV does not apply.  (*See* Union Dfts.

Reply at 4-5).

> The Supreme Court has stated as follows with regard to the doctrine of judicial estoppel:

>> " '[W]here a party assumes a certain position in a legal proceeding,
>> and succeeds in maintaining that position, he may not thereafter,
>> simply because his interests have changed, assume a contrary
>> position, especially if it be to the prejudice of the party who has
>> acquiesced in the position formerly taken by him.' *Davis v.
>> Wakelee*, 156 U.S. 680, 689 (1895).  This rule, known as judicial
>> estoppel, 'generally prevents a party from prevailing in one phase
>> of a case on an argument and then relying on a contradictory
>> argument to prevail in another phase.'  *Pegram v. Herdrich*, 530
>> U.S. 211, 227, n.8 (2000)."  *New Hampshire v. Maine*, 532 U.S.
>> 742, 749 (2001).

> Although this estoppel doctrine is equitable and thus cannot be reduced to a
> precise formula or test,

>> "several factors typically inform the decision whether to apply the
>> doctrine in a particular case: First, a party's later position must be
>> clearly inconsistent with its earlier position.  Second, courts
>> regularly inquire whether the party has succeeded in persuading a
>> court to accept that party's earlier position....  A third consideration
>> is whether the party seeking to assert an inconsistent position
>> would derive an unfair advantage or impose an unfair detriment on
>> the opposing party if not estopped."  *Id.*, at 750-751 (citations and
>> internal quotation marks omitted).

*Zedner v. United States*, 547 U.S. 489, 504 (2006); *see also United States v. Campa*, 459 F.3d

1121, 1152 (11th Cir. 2006) ("Courts consider two factors in determining whether to apply

[judicial estoppel]: whether the allegedly inconsistent positions were made under oath in a prior proceeding and whether such inconsistencies were calculated to make a mockery of the judicial system." (footnote and internal quotation marks omitted)).  Invocation of judicial estoppel is discretionary with the court.  *Stephens v. Tolbert*, 471 F.3d 1173, 1177 (11th Cir. 2006).

The court finds that application of judicial estoppel is not warranted.  The plaintiff has indeed taken inconsistent positions on some level with regard to the applicability of Title IV.  The plaintiff maintained in his complaint that Title IV applied to the disputed Grievance Chairman election, and it was one of the statutory foundations he cited for his claims and this court's jurisdiction.[34]  At this point, by contrast, Jackson has all but abandoned his Title IV claims.  He affirmatively contends that the Grievance Chairman position "is not an officer" of the Local (Pl. Brief in Opp. to Union Dfts. Summ. J. Mot. at 4, ¶ 24 and at 31), that this court has jurisdiction over his LMRDA claims pursuant to Title I (*id.* at 18-20), and that the union defendants' Title IV exclusivity argument is due to be rejected based on the Secretary's ruling that she has no jurisdiction (*id.* at 17-18), which rests squarely upon her determination that the disputed election did not involve an "officer" under Title IV.  Nonetheless, all other considerations weigh heavily against estoppel.  None of the relevant allegations or arguments made by the plaintiff in his complaint or his briefs are statements made under oath.  While the plaintiff included Title IV claims in his complaint, the court does not construe his apparent disavowal of reliance upon Title IV as amounting to an attempt to make "a mockery of the

---

[34] *See* Compl. at 1, "Introduction" (describing the action as one "for declaratory and injunctive relief and damages to redress the violation or deprivation of certain union rights of the plaintiff and members of the class under Title IV of the [LMRDA] ...."); *id.*, ¶ 1 (stating that jurisdiction exists pursuant to a (purported) grant found in Title IV, § 402(b) of the Act, 29 U.S.C. § 482(b)); *id.*, ¶ 16 (asserting the disputed election here "was subject to the provisions of Title IV of the LMRDA (29 U.S.C. § 481 et seq.)"; and *id.*, ¶ 37 ("The defendant union violated plaintiff's equal rights under §§ ... 401 and 402 of the LMRDA," which are  found in Title IV, 29 U.S.C. §§ 481 and 482).

judicial system."  This is particularly so given that the plaintiff was denied relief by the Secretary

for alleged Title IV violations and that this court is likewise not granting any such relief, for

reasons already discussed.  *Cf. Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795,

805 (1999) (stating that, where a plaintiff has merely applied for, but has not been awarded,

benefits under the Social Security Act and has also asserted a claim under the Americans with

Disabilities Act, "any consistency in the theory of the claims is of the sort normally tolerated by

our legal system.")  "Our ordinary Rules [of Civil Procedure] recognize that a person may not be

sure in advance upon which legal theory she will succeed, and so permit parties to 'set forth two

or more statements of a claim or defense alternately or hypothetically,' and to 'state as many

separate claims or defenses as the party has regardless of consistency.'" *Id.* (quoting Rule 8(e)(2),

FED. R. CIV. P.)  Finally, the union defendants have not shown that the plaintiff would derive an

unfair advantage or be imposing an unfair detriment if he is not estopped from arguing that Title

IV and its exclusivity provision does not apply.  Summary judgment is not due to be granted

upon the defendants' argument that jurisdiction is lacking over the plaintiff's claims brought

pursuant to statutes other than Title IV.

### B.    Title VII of the Civil Rights Act and 42 U.S.C. § 1981

The plaintiff has asserted claims pursuant to Title VII and § 1981 against "the

defendants" based allegations that he was removed as Grievance Chairman of the Local because

of both race discrimination and in retaliation for having engaged in protected expression.  As

explained below, the defendants do contest whether the plaintiff can prove, as a factual matter,

that his removal from office was based upon either race discrimination or unlawful retaliation.

However, they do not now dispute that, as a legal matter, such a removal might be subject to

redress under Title VII and § 1981.[35]

### 1.      Claims Under Title VII / § 1981 Against the Individual Defendants

Defendants Evans, Irwin, and Perry (hereinafter the "individual defendants") contend that they are entitled to summary judgment on the Title VII claims and the § 1981 claims asserted against them. They first say that the Title VII claims are due to be dismissed on the theory that the statute only authorizes potential liability against the union defendants and not against them as individuals. The plaintiff concedes that Title VII does not authorize individual capacity suits against these defendants. (Memorandum in Support of Plaintiff's Opposition to the Motion of (sic) Summary Judgment of Robert Erwin (sic) and Walter Evans[36] ("Pl. Brief in Opp. to Irwin & Evans Summ. J. Mot.") at 5); *see also Dearth v. Collins*, 441 F.3d 931, 933 (11th Cir. 2006); *Burden v. International Longshoreman*, 2006 WL 1612372 (S.D. Ala. 2006) (unpublished); *Oparaji, v. United Fed. of Teachers*, 418 F. Supp. 2d 139, 146 (E.D.N.Y. 2006). The plaintiff maintains, however, that these Title VII claims should not be dismissed in their entirety because they can be maintained against these defendants in their respective *official* capacities. While Title VII does permit official capacity suits, such claims against the individual defendants are the

---

[35]Labor unions are generally prohibited from engaging in race discrimination by Title VII, which provides in relevant part that "[i]t shall be an unlawful employment practice for a labor organization to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(c)(1); *see also Goodman v. Lukens Steel Co.*, 482 U.S. 656, 667 (1987); *Local 53 of Intern. Ass'n of Heat and Frost Insulators and Asbestos Workers v. Vogler*, 407 F.2d 1047, 1052 (5th Cir. 1969); *Burden v. International Longshoremen's Ass'n, Local No. 1410*, 510 F. Supp. 2d 618, 622-23 (S.D. Ala. 2007); *Williams v. United Steel Workers of Amer., AFL-CIO/CLC*, 234 F. Supp. 2d 542, 551 & n.7 (M.D.N.C. 2002). 42 U.S.C. § 1981 guarantees, among other things, that all persons shall have the right to make and enforce contracts on the same terms as white persons. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). Such provision also prohibits race discrimination by labor unions. *See Goodman*, 482 U.S. at 669, *superceded by statute on other grounds*, 28 U.S.C. § 1658, *as recognized in Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004). Both Title VII and § 1981 also prohibit labor unions from engaging in retaliation against those who make complaints opposing unlawful race discrimination. *See* 42 U.S.C. § 2000e-3(a); *Eliserio v. United Steelworkers of Amer. Local 310*, 398 F.3d 1071, 1076-77 (8th Cir. 2005); *Burden*, 510 F. Supp. 2d at 624; *see also CBOCS West, Inc. v. Humphries*, ___ U.S. ___, ___, 128 S. Ct. 1951, 1961 (2008).

[36]The "Memorandum in Support of Plaintiff's Opposition to the Motion of (sic) Summary Judgment of Robert Erwin (sic) and Walter Evans" is doc. 57.

31

functional equivalent of the claims that the plaintiff asserts against the union defendants.  *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991); *Wheeles v. Nelson's Elec. Motor Serv's*, 559 F. Supp. 2d 1260, 1267 (M.D. Ala. 2008).  As such, the official capacity Title VII claims against the individual defendants are redundant of the Title VII claims against the union defendants, and the former are therefore due to be dismissed.  *See id.; Wheeles*, 559 F. Supp. 2d at 1267.

The individual defendants contend that they are also entitled to summary judgment on the § 1981 claims.  The sole argument they make is that "the individuals are not the employer of the Plaintiff as defined in Title VII and do not have any contractual agreement with Plaintiff." ("Memorandum in Support of Defendants Walter Evans and Robert Erwin's (sic) Motion for Summary Judgment"[37] ("Evans & Irwin Summ. J. Brief") at 2).  However, unlike Title VII, individual employees can be held liable for discrimination under § 1981, and such liability is not dependent upon a showing of a contractual relationship between the plaintiff and the defendant. "[A] third party's interference with those rights guaranteed under Section[ ] 1981 . . . will subject such a person to personal liability."  *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir. 1975)[38]; *see also Leige v. Capitol Chevrolet, Inc.*, 895 F. Supp. 289, 293 (M.D. Ala. 1995) ("Supervisors with the capacity to hire and fire or those who can recommend such decisions are subject to liability under § 1981.")  Accordingly, the individual defendants are not entitled to summary judgment on the § 1981 claims on this basis.

---

[37]The "Memorandum in Support of Defendants Walter Evans and Robert Erwin's (sic) Motion for Summary Judgment" is doc. 43.

[38]The decisions of the former Fifth Circuit handed down before October 1, 1981 are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

## 2.   The Title VII / § 1981 Race Discrimination Claims

The parties agree that the requirements of proof and the analytical framework for Title

VII and § 1981 disparate treatment discrimination claims are the same.  (*See* Union Dfts. Summ.

J. Brief at 24 n.4; Pl. Brief in Opp. to Union Dfts. Summ. J. Mot. at 25-26); *see also Springer v.*

*Convergys Customer Management Group, Inc.*, 509 F.3d 1344, 1347 n.1 (11th Cir. 2007).

Accordingly, the court will address the sufficiency of the evidence to establish substantive

liability on these claims with a single analysis.

At the outset, the court finds it necessary to address the particular adverse actions and

decisions at issue in the plaintiff's claims alleging that the Local and the International are each

liable for having unlawfully removed him from the Grievance Chairman position because of race.

It is well established in the employment context that a plaintiff asserting claims under Title VII's

anti-discrimination clause must demonstrate that he suffered an "adverse employment action,"

amounting to a "serious and material change in the terms, conditions or privileges of employment

. . . , as viewed by a reasonable person under the circumstances."  *Butler v. Alabama Dep't of*

*Transp.*, 536 F.3d 1209, 1215 (11th Cir. 2008) (quoting *Davis v. Town of Park Lake, Fla.*, 245

F.3d 1232, 1239-40 (11th Cir. 2001) (emphasis omitted)).  Similar principles presumably apply

to claims alleging that a labor union subjects a plaintiff to unlawful race discrimination in

violation of Title VII.  *Cf. Thorn v. Amalgamated Transit Union*, 305 F.3d 826, 830-31 (8th Cir.

2002) (holding that a plaintiff alleging that her union violated Title VII's anti-retaliation

provision was not required to show that the union subjected her to an "adverse *employment*

action," but rather only that the union "took some materially adverse action against her as a union

member" (emphasis original)).  The plaintiff contends, and the defendants do not argue

otherwise, that the plaintiff's removal from office as Grievance Chairman, if motivated by race, was a materially adverse action that is subject to redress under Title VII and § 1981.

The parties part ways, however, with respect to the mechanics of the plaintiff's removal and the decisionmakers involved, which bears upon the potential liability of the Local and the International as distinct entities.  The plaintiff contends that the *International* might potentially be held liable for its action, taken in about November 2006, whereby the International Executive Board or its Appeal Panel upheld Carden's election protest.  The International does not argue otherwise, as that decision that effectively stripped the plaintiff of the right to hold the Grievance Chairman position on a permanent basis, i.e., for the remainder of its three-year term.  However, the plaintiff is also claiming that the Local is liable because, at the time that the International actually ruled on Carden's protest, the plaintiff had already been removed from office and Carden had been installed in his place, pursuant to action taken by the Local, specifically by a vote of the Local Executive Board, in August 2006.  The plaintiff claims that the individual defendants, who were members of the Local Executive Board, are also personally liable under § 1981.

Nonetheless, in their respective initial briefs, the defendants have entirely ignored the role played by the Local or its Executive Board members in the plaintiff's removal, instead focusing exclusively upon the decisions underlying International's ruling on Carden's protest.  In their respective reply briefs, the defendants acknowledge the plaintiff's claim based upon the action of the Local Executive Board but only insofar as they make a conclusory assertion that the International Executive Board that upheld Carden's protest was "the decision maker in this matter," thus implying that nothing said or done by the Local Executive Board or its members could evidence or constitute unlawful discrimination under Title VII or § 1981.  (Union Dfts.

34

Reply at 9).  Such argument is not timely insofar as it was not raised in the defendants' initial

briefs.  *See Carter v. University of South Ala. Children's & Women's Hosp.*, 510 F. Supp. 2d

596, 608 (S.D. Ala. 2007).  Moreover, the union defendants offer no further explication of this

argument, nor do they cite supporting authority.  Indeed, it is not at all clear why the Local should

be deemed a "non-decisionmaker" as a matter of law or that the Local's action in removing the

plaintiff in August 2006 is necessarily outside the purview of Title VII and § 1981.  While the

defendants urge that the International was the sole decisionmaker, it is undisputed that, at the

time that it reached its "decision," which occurred no earlier than the October 26, 2006 meeting

of the International's Appeal Panel, the plaintiff had already been removed from office as of mid-

August 2006, more than two months earlier, pursuant to the action of the Local Executive Board.

Further, the evidence is that the plaintiff was removed from office immediately following the

Local's action, belying the notion that the Local's vote might be viewed as a mere a

recommendation that was later accepted by the International.  Such circumstances support that

the Local was a decisionmaker.  *Cf. Quinn v. Monroe County*, 330 F.3d 1320, 1327-28 (11th Cir.

2003) (holding that if a county administrator acted pursuant to authority in terminating the

plaintiff, liability would attach upon the termination if done with retaliatory animus,

notwithstanding that termination could be appealed to a neutral board with the authority to

reinstate).

　　　　Because the defendants have failed to articulate a timely and substantial argument

challenging this element of the plaintiff's claim against the Local, the court's summary judgment

analysis will proceed under the assumption that the Local Executive Board's action of removing

the plaintiff was itself sufficiently material and adverse to subject the Local to liability under

both Title VII and § 1981 and Perry, Evans, and Irwin to liability under § 1981 only, if that removal action was motivated by race.[39]   Further, even to the extent that the International's ruling on the appeal, if done on a lawful basis, might have justified removing the plaintiff from office in November or December 2006, such would not necessarily preclude a finding of liability against the Local if its earlier removal of the plaintiff was racially discriminatory.  *Cf. Wallace v. Dunn Constr. Co.*, 62 F.3d 374, 378 (11th Cir. 1995) (recognizing that after-acquired evidence of an employee's wrongdoing that would have justified an employee's termination upon discovery does not bar all recovery under Title VII where the original termination was discriminatory but generally would preclude reinstatement and an award of frontpay).  The court now proceeds to examine the evidence of discriminatory intent.

A plaintiff may prove a claim of intentional race discrimination under Title VII or § 1981 through either direct evidence or circumstantial evidence.  *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006).  The parties dispute whether the plaintiff can present

---

[39]Frankly, the court has some doubts about whether the conduct of the individual defendants, such as it has been disclosed in the summary judgment record, is actually sufficient to subject any of them to personal liability under § 1981, relative to the plaintiff's removal from office, or otherwise.  However, the *only* argument that the individual defendants make in their initial brief in favor of summary judgment on the § 1981 claims (aside from piggybacking on the substantive liability arguments raised by the union defendants) is based upon their assertion that none of them had a contract with the plaintiff.  That fact appears undisputed, but, for the reasons previously explained in the text, that fact alone does not entitle the individual defendants to judgment as a matter of law on claims brought pursuant to § 1981, as required for summary judgment.  It is the duty of a movant, not the court, to present all arguments and evidence necessary to showing entitlement to summary judgment.  Further, unless the notice requirements of Rule 56, FED. R. CIV. P., are first satisfied, a district court may not grant summary judgment based upon the purported insufficiency of the evidence to establish claims or elements of claims that have not been properly challenged by the movant.  *See Imaging Business Machines, LLC v. BancTec, Inc.*, 459 F.3d 1186, 1191 (11th Cir. 2006).  Evans and Irwin have argued in their reply brief that they are entitled to summary judgment on the plaintiff's claims based upon his removal from office because, these defendants say, "[t]here is not any evidence that these individuals played any role in that decision." (Defendants Walter Evans and Robert Irwin's Reply to Plaintiff's Response to Motion for Summary Judgment ("Dfts. Evans & Irwin's Reply, Doc. 63, at 2).  However, this argument is untimely because it was not raised in the initial brief.  *See Carter v. University of South Ala. Children's & Women's Hosp.*, 510 F. Supp. 2d 596, 608 (S.D. Ala. 2007).  Further, a defendant does not carry his initial summary judgment burden simply by saying that the plaintiff has "no evidence" on a claim or an element thereof.  *See Four Parcels*, 941 F.2d at 1438 n.19.  Given that none of the defendants' initial summary judgment submissions have argued or attempted to prove *anything* about the decision of the Local Executive Board to remove the plaintiff, the defendants have failed to produce any evidence demonstrating a lack of either involvement by, or unlawful motives of, Perry, Evans, and Irwin, as members of the Local Executive Board, in the plaintiff's August 2006 removal from office.  Accordingly, such ground is not a proper basis for granting them summary judgment.

direct evidence of discrimination, which is potentially significant, for such evidence is itself

sufficient to create a jury question on the issue of a defendant's discriminatory motivation.  *See*

*Bass v. Board of County Com'rs, Orange County, Fla.*, 256 F.3d 1095, 1112 (11th Cir. 2001),

*abrogated on other grounds*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), *as*

*recognized in Crawford v. Carroll*, 529 F.3d 961, 971-73 (11th Cir. 2008).  If the plaintiff lacks

direct evidence, on the other hand, he must attempt to create an issue of fact using circumstantial

evidence of discrimination, evaluated pursuant to the burden-shifting framework established by

the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't*

*of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

     In support of his claim that he can present direct evidence of discrimination, the plaintiff

points to the testimony of Richard Leach, a Trustee of the Local and a member of its Executive

Board.  The plaintiff argues that Leach testified that several members of the Local Executive

Board made remarks indicating that they voted to remove the plaintiff from the Grievance

Chairman position in August 2006 and install Carden in the post because of race.  (*See* Pl. Brief

in Opp. to Union Dfts. Summ. J. Mot. at 13-14, 22-23).  The union defendants dispute that these

remarks might constitute direct evidence because, the union defendants claim, the only

"decisionmaker" relative to the plaintiff's removal was the *International* Executive Board that

upheld Carden's election protest and ultimately awarded him the position, not the *Local*

Executive Board.  (Union Dfts. Reply at 9).  The union defendants are certainly correct that

remarks made by members of the Local Executive Board are not direct evidence of the motives

of the International Executive Board or its Appeal Panel that upheld Carden's appeal.  *See*

*Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("[R]emarks by non-

37

decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination.")  But the plaintiff does not contend he has direct evidence of the International's discriminatory animus relative to Carden's protest, so the plaintiff's claims relative to the International's ruling are undisputedly subject to the *McDonnell Douglas* framework.  Rather, what the plaintiff claims is that his removal from the Grievance Chairman position in August 2006 by the vote of the Local Executive Board is itself actionable and that the remarks of its members constitute direct evidence of its discriminatory intent.  Ultimately, however, the court need not resolve whether Leach's testimony supplies direct evidence of discriminatory intent on the part of the Local Executive Board because there is sufficient evidence in the record to create a jury question on that issue even if the plaintiff is required to do so using only circumstantial evidence under the *McDonnell Douglas* framework, as discussed below.

Where a plaintiff seeks to prove a claim using circumstantial evidence, the plaintiff has the initial burden at trial to prove a prima facie case of discrimination.  *Burdine*, 450 U.S. at 252-53.  "Under the *McDonnell Douglas* scheme, '[e]stablishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee.'"  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993) (quoting *Burdine*, 450 U.S. at 254).  This presumption "places upon the defendant the burden of producing an explanation to rebut the prima facie case- *i.e.*, the burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'"  *Id.*, 509 U.S. at 506-07 (quoting *Burdine*, 450 U.S., at 254)  Once the defendant produces sufficient evidence to support a nondiscriminatory explanation for its decision, the plaintiff must be afforded the "opportunity to

38

prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (*quoting Burdine*, 450 U.S. at 253).

The union defendants contend that the plaintiff cannot make out a prima facie case of discrimination regarding his removal. Citing *McDonnell Douglas*, they argue that in order to establish a prima facie case, the plaintiff must prove the following elements: (1) that he belonged to a protected class; (2) that he was qualified for an available position; (3) that he was rejected; and (4) that the position was filled with an individual outside of the protected class. (Union Dfts. Summ. J. Brief at 24). The union defendants argue that the plaintiff cannot show that he was "qualified" for the position because he did not receive the most votes. (*Id.*)

At the outset, it should be noted that "[t]he *McDonnell Douglas* prima facie case method was 'never intended to be rigid, mechanized, or ritualistic.'" *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004) (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978))). "It is merely a procedural device to facilitate an orderly focused evaluation of the evidence 'as it bears on the critical question of discrimination.'" *Id.* (quoting *Aikens, supra*). Further, *McDonnell Douglas* itself, like the great majority of Title VII cases, involved an adverse action by an *employer* regarding the plaintiff's *employment*, specifically the failure of an employer to *re-hire* a former employee. *See* 411 U.S. at 794-96. The case sub

39

judice, by contrast, involves *labor organizations* who *removed* the plaintiff from an *elected union position*.  Because this case does not fit neatly into a classic prima facie case formula, "[a] prima facie case of disparate treatment can be established by any 'proof of actions taken by the [defendant] from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations.'"  *Schoenfeld v. Babbit*, 168 F.3d 1257, 1268 (11th Cir. 1999) (*quoting Hill v. Metropolitan Atlanta Rapid Transit Auth.,* 841 F.2d 1533, 1540 (11th Cir. 1988) (quoting *Furnco Constr. Corp.,* 438 U.S. at 576))).

The evidence in this case shows that the plaintiff is African American; that he was removed from the Grievance Chairman position; and that upon the plaintiff's removal, the office was filled by Carden, who is white.  The defendants assert that the plaintiff cannot show that he was "qualified" for the position because Carden undisputedly received the most votes among the candidates appearing on the ballot.  However, that argument fails to confront the true issue, which is whether *Carden* was *eligible* to serve *despite* having received the most votes, given that he undisputedly failed to win the Committeeman race for his area.  If Carden was not eligible, as the plaintiff claims, then it is undisputed that the plaintiff had the "most votes" among the candidates on the ballot who ultimately were eligible to serve.  The evidence establishes that plaintiff was initially deemed the winner of the election by the Local Election Committee, based upon its interpretation of the eligibility qualifications, and, pursuant to the action of the Local, the plaintiff began serving in the post in June 2006.  The Elections Manual promulgated by the International expressly states that when there has been a protest of a local union election to the International Executive Board, the "Local Union action shall remain in effect unless stayed, set

40

aside or modified by action of the International Executive Board." (Elections Manual at 45). At the time the plaintiff was removed by the Local Executive Board, however, Carden's appeal of the election to the International was still pending. The court concludes that the foregoing circumstances, standing unrebutted, are sufficient to allow a jury to find that the plaintiff was qualified to serve as Grievance Chairman and create a presumption that he was removed from office because of race.

The burden now shifts to the union defendants to articulate one or more legitimate, non-discriminatory reasons for the challenged actions. "This burden is exceedingly light; the defendant must merely proffer non-gender based reasons, not prove them." *Ledbetter v. Goodyear Tire and Rubber Co., Inc.*, 421 F.3d 1169, 1185 (11th Cir. 2005). However, the defendant "must clearly set forth, through the introduction of admissible evidence, the reasons" for its challenged action." *Increase Minority Participation by Affirmative Change Today of Northwest Florida, Inc. v. Firestone*, 893 F.2d 1189, 1193 (11th Cir. 1990) (quoting *Burdine*, 450 U.S. at 255) (emphasis omitted); *see also Combs v. Plantation Patterns*, 106 F.3d 1519, 1535 n.9 (11th Cir. 1997). Thus, "the defendant cannot testify in abstract terms as to what might have motivated the decision maker; it must present specific evidence regarding the decision-maker's actual motivations with regard to each challenged employment decision." *Walker v. Mortham*, 158 F.3d 1177, 1182 (11th Cir. 1998).

As stated previously, the union defendants do not address in their briefs the role played by the Local and its Executive Board in the plaintiff's removal from office in August 2006. While they summarily state in their reply brief that the International Executive Board was "the decisionmaker" on the plaintiff's removal, thereby suggesting that the Local Executive Board

41

was not a decisionmaker, the union defendants have failed to articulate why this should be deemed so, either factually or legally. The Local has not argued a basis for concluding that the action taken by the Local in August 2006 is not sufficiently material or adverse to support a claim under federal anti-discrimination laws, nor have the union defendants directed the court's attention to evidence in the record setting forth a reason for the action taken by the Local Executive Board. As such, the court must conclude that the Local has failed to satisfy its intermediate burden under *McDonnell Douglas,* and the Local is not entitled to summary judgment on the plaintiff's claims alleging that the Local removed him from office because of race, in violation of Title VII and § 1981.

By contrast, the union defendants have sought to address the motivation of the International in its action upholding Carden's protest. The record evidences a summary of the decision of the International Executive Board Appeal Panel (the "Appeal Panel") on Carden's protest, as follows:

"The appellant protested the election because, based on an interpretation of an old bylaw, the election committee ruled that [the plaintiff] won the Grievance Chairman position even though Brother Carden received the most votes. The protest was denied by the Commission membership.

"The Commission found that there was testimony that the local union had voted prior to the election to elect the Grievance Chairperson by whomever received the majority of votes. However, the local president produced an old bylaw that states that in order to win the position of Grievance Chairperson, you must win the Grievance Committee position in your area. Testimony was given that indicated that this had been the practice for years. The commission recommends that the Teller's Report be upheld and the appeal be denied.

"The Appeal Panel found that there was evidence that the membership had voted to have the person receiving the most votes installed as Grievance Chair, regardless of the other grievance positions. Further, the panel found that the bylaws relied upon by the Commission had never been approved by the

42

International Union.

> "The appeal of Gene Carden is granted.  He is to be installed as the
> Grievance Chairperson and the local union will now have four local members of
> the Grievance Committee."

(Conway Dep. at 39-40; *see also* "104th Meeting of the International Executive Board Appeal

Panel Summary of Cases").  Conway, the Chairman of the Appeal Panel, also provided

additional insight in his deposition on the decisional basis and process underlying the ruling:

> "There's two things.  As I understand, there's two things, that the local
> union has made some decision that the top vote getter is going to win the election,
> and that [Bill] Gunnin [the current president of the Local] is saying that not the
> case.  There's an old set of bylaws.  That's the case I think comes to me.  Here we
> have a guy who got the most votes.  We have the guy who is the second vote
> getter who says, 'No, I should win based upon these old bylaws.'

> "I don't know what discussions are taking place.  It comes to us.  And I'm
> told by our people, 'There is no old bylaws on record that are approved, and our
> Constitution requires the guy with the plurality, with the most votes gets the thing
> (sic).'

> "So this is almost kind of if we don't have the bylaw on record and it's not
> approved – and I can understand how Anderson [the International Commissioner
> who conducted the hearing on Carden's appeal] on the ground has the bylaw in
> front of him that Gunnin has given him, but here in Pittsburgh there is not an
> approved bylaw.  And in order to sort of do what's democratically right, we go
> with the top vote getter.  That's my role in this.  And it's almost administrative in
> nature.  No one comes.  No one makes a case.  No one makes an argument.  I
> don't see people.  I don't know these guys."

(Conway Dep., Doc. 54, Exhibit S, at 48).  The court concludes that the International has

satisfied its intermediate burden to articulate a non-discriminatory reason why it upheld Carden's

protest.

In the third and final stage of the analysis, the question becomes whether the plaintiff can

point to evidence sufficient to allow a jury reasonably to conclude that the reasons offered by the

International are a pretext for unlawful discrimination.  "[The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.  The plaintiff attempts both approaches.

The plaintiff's brief is peppered with allegations that numerous individuals made statements regarding race and racial animus and the role that they allegedly played in the plaintiff's removal from office.  However, the plaintiff does not point to evidence showing that any of the people actually involved in the relevant decision to uphold Carden's protest, i.e., the members of the International's Appeal Panel,[40] made racist remarks, treated similarly-situated whites more favorably, or engaged in other conduct suggesting that a discriminatory reason more likely motivated its ruling.  "'[S]tatements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process' at issue will not satisfy the employee's burden [to prove pretext]."  *Steger v. General Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003) (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277 (1989) (O'Connor, J., concurring))); *see also Rowell v. BellSouth Corp.*, 433 F.3d 794, 802-03 (11th Cir. 2005).  Accordingly, the plaintiff must show that the reasons offered for the Appeal Panel's decision are unworthy of

---

[40]The court notes that the union defendants have asserted that the decision of the Appeal Panel "was *upheld* by the full [International] Executive Board" (Union Dfts. Summ. J. Brief  at 6, ¶ 19) (emphasis added), potentially opening the door to an argument that the International Executive Board should be deemed an independent decisionmaker on Carden's protest.  *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331-32 (11th Cir. 1999) (discussing the "cat's paw" theory of liability).  However, the court agrees with the plaintiff that the record does not support that the International Executive Board itself actually undertook any sort of substantive or independent review of the decision of the Appeal Panel.  Rather, the evidence shows that the Appeal Panel heard Carden's protest on October 26, 2006, and that Conway, in his capacity as Chairman of the Appeal Panel, then wrote a letter to Carden dated November 2, 2006, with copies to several officers of the Local, stating that Carden's protest "is upheld" and that he therefore "should be installed [as Chair of the Grievance Committee] immediately."  The only action shown to have been taken on the matter by the International Executive Board itself did not occur until some six weeks later.  Specifically, at a meeting held December 18-20, 2006, the International Executive Board passed a motion by Conway that summarily "approved" the full report of the Appeal Panel, which encompassed its rulings on twenty-five local union election protests, including Carden's, plus several other matters.  The defendants have not pointed to any evidence indicative of the motivations of the International Executive Board in taking such action.

credence.

"[A] plaintiff's prima facie case, combined with sufficient evidence that the [defendant's] asserted justification is false, may permit the trier of fact to conclude that the [defendant] unlawfully discriminated." *Reeves*, 530 U.S. at 148; *see also id.* at 149 ("the Court of Appeals erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination [in order to show pretext].") However,

> [a] plaintiff is not allowed to recast [a defendant's] proffered nondiscriminatory reasons or substitute his business judgment for that of the [defendant. Provided that the proffered reason is one that might motivate a reasonable [defendant, a plaintiff] must meet that reason head on and rebut it, and the [plaintiff] cannot succeed by simply quarreling with the wisdom of that reason.

*Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*). Further, "'[p]retext is not demonstrated by showing simply that the [defendant] was mistaken.'" *E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000) (quoting *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995)). "Evidence showing a false factual predicate underlying the [defendant's] proffered reason does not unequivocally prove that the [defendant] did not rely on the reason in making the [adverse] decision. Instead, it may merely indicate that the [defendant], acting in good faith, made the disputed ... decision on the basis of erroneous information." *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1564 (11th Cir. 1995) (Johnson, J., specially concurring). The Eleventh Circuit has explained:

> [f]ederal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [federal anti-discrimination law] does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior."

*Chapman*, 229 F.3d at 1030 (quoting *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th

Cir. 1991) (quoting *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted))).  "In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the [defendant's] proffered nondiscriminatory reasons is pretextual." *Id.*, 229 F.3d at 1037 (citing *Combs v. Plantation Patterns*, 106 F.3d 1519,1543 (11th Cir. 1997)).

The evidence indicates that the proffered reasons for the Appeal Panel's decision to uphold Carden's protest, thereby holding that he, rather than the plaintiff, was entitled to be Grievance Chairman was based upon the panel's having found two things: (a) that Carden received the most votes among the candidates for Grievance Chairman appearing on the ballot, and (b) that the post was subject to election based upon a simple plurality vote among those appearing on the ballot, without regard to an alleged additional eligibility qualification that a candidate also had to win a separate, contemporaneous race for Grievance Committeeman from his area.  That Carden received the most votes is not in dispute.  The question is whether the plaintiff can show pretext regarding the claim that the Appeal Panel ruled as it did based upon a determination that the position was subject to a simple plurality vote among those appearing on the ballot.  As the court perceives it, the evidence indicates that the Appeal Panel's decision on that issue is, in turn, founded upon two asserted "sub-reasons":

> (1)     that the Local membership had voted prior to the April 2006 election to elect the Grievance Chairman from the ballot based upon a plurality vote of the membership; and

> (2)     that the International constitution provides a default rule whereby local union officials are elected by a plurality vote unless modified by a local by-law approved by the International, and no by-law of the Local purporting to modify the default rule was on file with the International as having been so approved.

The plaintiff raises a host of arguments in attempts to attack the credence of both of the above theories.

The court concludes that the arguments and evidence cited by the plaintiff fail to create an issue of fact regarding whether any of the reasons asserted for the Appeal Panel's decision was a pretext for unlawful discrimination. The fundamental weakness in the plaintiff's arguments is that his cited proof fails to suggest that the Appeal Panel did not honestly rely upon an adherence to the core democratic principle that the candidate on the ballot with the most votes is entitled to prevail, based upon a good-faith belief that there was an effective motion passed at the March meeting whereby the Grievance Chairman position was made subject to a straight plurality vote of the membership and that union law similarly provided for such a vote. Rather, the plaintiff has merely quarreled with the wisdom of the Appeal Panel's reasoning and claimed that its understanding of events and its interpretation of union law was mistaken. The plaintiff first contends that, although the Appeal Panel supposedly relied upon the fact that the Local had voted prior to the election to elect the Grievance Chairman based upon the person who received the most votes, the Local did not actually do so. (*See* Pl. Brief in Opp. to Union Dfts. Summ. J. Mot. at 29-30). The plaintiff acknowledges that at the March 2006 meeting of the Local just prior to the election, the membership passed a motion made by Gunnin, whereby the Chairman position would be placed on the ballot and voted on by the membership. The plaintiff points out, though, that Gunnin has testified that his motion was to put the position on the ballot but always with the proviso that, consistent with the Local's prior practice, a person would still have to be elected as Committeeman for his own area in order to serve as Chairman. (*See id.* at 29-30; *id.* at 7, ¶ 6; Gunnin Dep. at 18-19). Regardless, the record is clear that the Appeal Panel had before it

materials from the Commission that investigated Carden's protest expressly acknowledging both hearing witness testimony and an entry in the Local's meeting minutes reflecting that such a motion was so approved.[41]  The plaintiff highlights that the meeting minutes do not expressly say that the person with the most votes would automatically be elected but rather document only the following: "A motion by Bill Gunnin and 2nd by Deginald Hill to elect a Grievance Chairman from the ballot.  All approve."  (March Meeting Minutes).  Nonetheless, such potential ambiguity in the minutes does not call into question the motives of the Appeal Panel.  The norm for elections is that the candidate on the ballot who receives the most votes is awarded the office without reference to whether a candidate was deemed to have *also* won a separate, contemporaneous election for another office.  Thus, it would be reasonable, if not wholly expected, for the Appeal Panel to assume that, in the absence of proof regarding a valid by-law or an express eligibility qualification provision relative to the motion, placement of the Grievance Committee Chairman position on the ballot did itself imply election by simple plurality vote.

This is especially true in light of the applicable underlying positive union law, which establishes simple plurality votes for elections of local union officials generally.  The International Constitution creates a default rule whereby "[a]ll Local Union Officers and Grievance Committee Members shall be elected . . . by a plurality vote of the Local members participating in a referendum vote . . . ."  (Int'l Const. Art. VII, § 8).  The Amalgamated Standard Bylaws applicable to the Local similarly provide in relevant part: "Local Union Officers and Unit

---

[41]Morris Anderson, the International Commissioner who initially heard Carden's protest actually recommended in his report that it be denied.  However, that report states in relevant part, "Witnesses testified about a union meeting prior to the election in which a motion was made and approved by the members present to elect the Grievance Chairman by whoever received the majority of votes. . . .  This was verified by the Local Union Minutes book."  (Doc. 54, Exhibit M, at 3).  The subsequent summary of the Commission's findings regarding the protest likewise state: "The Commission found that there was testimony that the Local Union had voted prior to the election to elect the Grievance Chairperson by whoever received a majority of votes."  (Doc. 38, Exhibit 4 at USW000338).

Officials shall be elected . . . .  Election shall be by a plurality vote of the members in good standing participating in a secret ballot vote."  (Amal. Std. Bylaws Art. IV, § 3(a)).  The plaintiff claims that the Appeals Counsel should have recognized that the foregoing constitutional and by-law provisions did not apply, on they theory that they describe elections for "Grievance Committeemen" but not for the Grievance Committee *Chairman*.  (*See* Pl. Brief in Opp. to Union Dfts. Summ. J. Mot. at 31).  Suffice it to say that such quibbling fails to show pretext.  It is perhaps arguable that the positive sources of union law do not explicitly address the manner of selection of a local Grievance Committee Chairman or whether to serve in such office requires prevailing in an area Committeeman race.  However, the plaintiff has not directed the court to any provision of either the International constitution, the Amalgamated Bylaws, other standard bylaws, or the Elections Manual that clearly established the office eligibility qualification he urges.  The Appeals Panel may have interpreted textual ambiguities in a manner adverse to the plaintiff, but its decision was an entirely reasonable and plausible one given the information before it, and there is no basis on this point from which to infer objectively that the Appeal Panel has not given an honest account of its behavior.

The plaintiff also points to the 1957 Bylaws.  These admittedly provide on their face that the election of the Grievance Committee Chairman for the Local is to occur at the same time as the officers of the Local and that a person must win his area race for Grievance Committeeman in order to serve as the Chairman.  The Appeal Panel recognized this argument in its ruling, but it found that the by-law in question was not valid because there was no record that it was ever approved by the International.  Under the International Constitution and the Amalgamated Standard Bylaws, the 1957 Bylaws are invalid unless they were approved by the International,

and the plaintiff has failed to produce any evidence vitiating the Appeal Panel's finding that the 1957 Bylaws had never been so approved.  Instead, the plaintiff summarily asserts that the 1957 Bylaws were valid, apparently without regard to approval by the International, because the Local filed them with the Secretary of Labor pursuant to the LMRDA.  However, the plaintiff has not cited authority supporting that such a proposition has any foundation in law.  Nor has he pointed to evidence indicating that the Appeal Panel members were even aware of the Local's submission of the 1957 Bylaws to the Secretary.

The plaintiff also urges that, even if a motion had passed at the March 2006 meeting of the Local to elect the Grievance Chairman based upon a straight plurality vote, such a motion, he says, implicated a change to the Local's bylaws thus would have to be read at three consecutive meetings of the Local, passed by its membership, and then approved by the International.  Since that undisputedly did not occur, any such motion, the plaintiff says, would not have been effective and this should have been recognized by the Appeal Panel.  (*See* Pl. Brief in Opp. to Union Dfts. Summ. J. Mot. at 30-31; *see also id.* at 15-16 ¶ 26).  It is true that the Amalgamated Standard Bylaws require compliance with such a procedure in order to effectuate changes to standard or otherwise existing bylaws.  (*See* Amalgamated By-Laws Art. XIX, § 3).  Nonetheless, the plaintiff has not pointed to any evidence indicating that the issue of the formal validity of the motion was ever raised with the Appeal Panel.  It can hardly be argued that the asserted basis of the Appeal Panel's resolution of Carden's appeal amounts to pretext based upon the Panel's failure to credit to an argument or a circumstance that was unknown to it.  But even if this argument was presented, it still would not matter.  As explained previously, even without a motion passing at the March meeting of the Local, the evidence before the Appeal Panel showed

50

the following: (1) the Local had conducted a membership ballot election for the Grievance Chairman position, (2) Carden had undisputedly received the most votes among the three candidates appearing on the ballot, (3) the International constitution, the Amalgamated By-Laws, and the Election Manual all provide for election of Officers, Grievance Committee Members, and Unit Officials by a plurality vote; (4) none of those sources contain a provision specifying that a Grievance Committee Chairman must also always win a separate Committeeman election for his production area; and, (5) the 1957 By-Laws relied upon by the plaintiff had not been approved by the International and were thus invalid.  So regardless of the formal validity of the motion at the March 2006 meeting, the matters put before the Appeal Panel amply justified a ruling in Carden's favor.

The plaintiff also relies upon the CBA to support his cause.  He claims that "all of the Collective Bargaining Agreements for the past 50 years" between the International and U.S. Steel provided that "to serve as the Grievance Committee Chairman, a member had to win the Grievance Committeeman position for his unit."  (Pl. Brief in Opp. to Union Dfts. Summ. J. Mot. at 31; *see also id.* at 5-6, ¶ 4).  From this, the plaintiff suggests, the Appeal Panel should have recognized the existence of such a requirement regarding the disputed office here.  Again, the plaintiff points to no evidence that any argument regarding the CBA was raised to, or considered by, the Appeal Panel.  But equally to the point, the premise that the CBA even potentially created such an eligibility requirement with regard to the Grievance Chair office at issue is unsupported.  Specifically, the portions of the CBAs relied upon by the plaintiff, which are dated 1999, 1994, 1980, 1977, 1971, and 1965, provide in relevant part: "The grievance committeemen shall be selected by the Union from the plant unit they are to represent.  However, in no case shall there

51

be more than one grievance committeeman selected from any one plant unit." (*See* CBA's between United States Steel Corporation and the United Steelworkers of America, dated 1999, 1994, 1980, 1977, 1971, and 1965,[42] § 6(I)(2)).  Even assuming that such language implied that the Chairman of the Grievance Committee had to be a Committeeman from his area, it was not included in the CBA in effect at the time of the election and of the Appeal Panel's decision. Rather that CBA, dated May 20, 2003, provides in relevant part: "[N]o more than one member of the [Grievance] Committee shall be from any one department (*excluding the Grievance Chair and Secretary*)." (CBA dated May 20, 2003[43] at 94, § I(5)(a) (emphasis added)).  Thus, the relevant CBA does not support the plaintiff's position.

The plaintiff also alleges that the International assumed control of the Local in 1995 and held its elections in 1996, in which it was required that the person serving as Grievance Chairman win his unit election for Committeeman.  The fact that an election may have been held ten years earlier with such an eligibility requirement simply fails to suggest that the proffered basis of the Appeal Panel is disingenuous.  Even if the election procedures were not contested by individuals affiliated with the International during a period that the Local was under a trusteeship, the evidence suggests that there had never been an outcome like the one related to the 2006 election, in which a person got the most votes for Grievance Chairman but lost his area race.  (*See* S. White Dep. at 57-58).  Nor is there an indication that any dispute arose regarding the qualifications or results of 1996 election.  There is also nothing to show that the members of

---

[42]The relevant sections of these CBA's are included in the materials designated "Relevant Sections of Past CBA(s)," Exh. U to Pl. Evid. Sub.

[43]The relevant section of the 2003 CBA is also included in the materials designated "Relevant Sections of Past CBA(s)," Exh. U to Pl. Evid. Sub.

the Appeal Panel were made aware of the circumstances of that earlier election.  This evidence does not create an issue of material fact regarding pretext with respect to the ruling whether the decision of the Appeals the pretext inquiry.  *Cf. Jones v. Gerwens*, 874 F.2d 1534, 1541-42 (11th Cir. 1989) (where decisionmaker is unaware of allegedly similar violations of employer policy by persons outside of the protected class, the fact that such other individuals were not subjected to discipline does not suggest an unlawful discriminatory animus).

Finally, the plaintiff says that Conway, the Chairman of the Appeal Panel, allegedly made statements to Gunnin indicating that he, Conway, "made a mistake in overturning the Commissioner's decision [on Carden's protest]" and had "gotten some bad advice from persons at the Local . . . ."  (Pl. Brief in Opp. to Union Dfts. Summ. J. Mot. at 17, ¶ 28; *see also id.* at 24-25).  However, the admissible evidence relating to these allegations falls short of showing pretext.  The plaintiff relies primarily upon the declaration of Joseph Thomas, the Local's Civil Rights Officer, which includes a number of statements setting forth what Gunnin told Thomas about what Conway had allegedly told Gunnin on an occasion when Thomas was not present.  (*See* Declaration of Joseph Thomas[44] ("Thomas Decl.") ¶¶ 7-9).  Even assuming that statements made by Conway to Gunnin relating to Conway's ruling on Carden's protest might be deemed non-hearsay as an admission of a party opponent or otherwise, to the extent that Thomas's declaration is offered to prove what Conway supposedly said to Gunnin, it is inadmissible hearsay under Rule 801, FED. R. EVID.  *See City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 561-62 (11th Cir. 1998).  Thus, it cannot defeat summary judgment.  *See Reese v. Herbert*, 527 F.3d 1253, 1271 n. 29 (11th Cir. 2008); *see also* Rule 56(e)(1), FED. R. CIV. P.

---

[44]The declaration of Joseph Thomas is Exh. L to Pl. Evid. Sub.

The only other evidence cited by the plaintiff is an allegation by Gunnin himself, in which he says that he had a brief conversation with Conway in which Gunnin said that he did not agree with the Appeal Panel's decision on the protest and Conway allegedly replied that he was "given misinformation."  This vague statement is not sufficient to prove pretext even as to the motives of Conway.

Further, Conway is only one of six members on the Appeal Panel.  (*See* Conway Dep. at 10).  Where an adverse action is taken by a multi-member board or committee, a plaintiff has the burden to show that a majority of the voting members of the entity were motivated by a prohibited animus, and the unlawful motives of one or more individual members comprising a minority of those voting are not imputed to the board as a whole.  *See Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th Cir. 2002) (*per curiam*); *Mason v. Village of El Portal*, 240 F.3d 1337, 1339 (11th Cir. 2001); *Rolle v. Worth County School Dist.*, 128 Fed. Appx. 731, 733 (11th Cir. 2005)*; Collier v. Clayton County Community Service Bd.*, 236 F. Supp. 2d 1345, 1373-74 (N.D. Ga. 2002).  Thus, even if some or all of the alleged comments attributed to Conway cast doubt on his motives, they would not suggest pretext as to motives of the Appeal Panel as an entity.

The court concludes that the plaintiff has failed to create an issue of fact with regard to whether the proffered reasons of the International's Appeal Panel are a pretext for unlawful discrimination.  As a result, the International is entitled to summary judgment on the plaintiff's claims brought pursuant to Title VII and § 1981 alleging that the International removed the plaintiff from office as the Grievance Chairman because of race.

3.      **The Title VII / § 1981 Retaliation Claims.**

The defendants have also moved for summary judgment on the plaintiff's retaliation claims brought pursuant to Title VII and § 1981.  In order to make out a prima facie case of retaliation under Title VII or § 1981, a plaintiff is required to show: (1) that he engaged in statutorily protected activity; (2) that he suffered a material adverse action at the hands of the defendant, and (3) that there was a causal connection between the protected activity and the adverse action.  *See Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1212-13 (11th Cir. 2008); *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).

The defendants argue that they are entitled to summary judgment because the plaintiff had not engaged in any statutorily protected activity prior to the adverse action in question, the plaintiff's removal from office as Grievance Chairman.  The defendants acknowledge that the plaintiff engaged in a protected activity through his filing of an EEOC charge in January 2007, but they argue there can be no possible link between the plaintiff's having done so and his removal from office, which occurred earlier.  (*See* Union Dfts. Summ. J. Brief at 26).  The court agrees that the EEOC logically cannot have been the basis for the earlier-made decisions of the Local or the International.  *See Griffin v. GTE Florida, Inc.*, 182 F.3d 1279, 1284 (11th Cir. 1999) ("At a minimum, [a plaintiff] must show that the adverse act followed the protected conduct.").  However, the plaintiff responds that he can make out a prima facie case of retaliation based his having engaged in several other types of protected opposition occurring prior to his removal from office.

First, the plaintiff says that he engaged in protected activity in that he allegedly "reported that the Grievance Chairman, Gene Carden, had called Lyndon Dubose [another U.S. Steel

55

employee and union member] a nigger," in an "incident [that] took place a couple months before the 2006 election."  (Pl. Brief in Opp. to Union Dfts. Summ. J. Mot. at 33).  In his brief, the plaintiff does reference evidence indicating that Carden used the aforementioned epithet on what appears to have been one occasion.  (*See id.* at 2, ¶ 6, citing Bryant Dep. at 48-52).  The plaintiff has further alleged that sometime "[b]efore the election, [he] reported the incident to the International and attempted to file a claim against Gene Carden for racism."  (Plaintiff's Declaration[45] ("Pl. Decl.") ¶ 11).  However, Carden's use of the epithet in the isolated manner alleged would not even arguably approach the level of an unlawful employment practice or a violation of § 1981, so any internal complaint the plaintiff may have lodged regarding the incident would not constitute protected activity for purposes of Title VII or § 1981.  *See Butler*, 536 F.3d at 1213-14.

Second, the plaintiff says that "[he] was always outspoken about racism in the Union." (Pl. Brief in Opp. to Union Dfts. Summ. J. Mot. at 33; *see also id.* at 22-23 ("The testimony in this case from some was that William Jackson was removed from his elected Grievance Chairman position by the Executive [B]oard because his is outspoken ... .))  However, he fails to state, never mind point to evidence establishing, the particulars of what he allegedly complained about, to whom, or when.  This vague and unsupported assertion cannot defeat summary judgment.

Third and finally, the plaintiff claims he engaged in protected activity under Title VII based upon his filing a complaint with the Department of Labor regarding his removal from office.  (*Id.*)  The record does show that the plaintiff filed a complaint with the Secretary of Labor

---

[45]The plaintiff's declaration is included in Exh. L to Pl. Evid. Sub.,

on August 22, 2006, about a week after the plaintiff was removed from office by the vote of the

Local Executive Board but several months before the International ruled on Carden's protest.

(*See* Gov't Correspondence at 1).  It might be assumed that the plaintiff's filing of a complaint

with the Secretary asserting that he had been removed from union office because of race could

constitute protected activity under Title VII and § 1981.  However, the plaintiff has not pointed to

any evidence supporting that his filing actually complained that the a union had removed him

from office or otherwise took adverse action *because of race*, as opposed to simply in violation

of union rules and by-laws.  In the absence of such an allegation, the complaint would not

amount to protected activity.  *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th

Cir. 2006) ("Although filing an official complaint with an employer may constitute statutorily

protected activity under Title VII, the complaint must indicate the discrimination occurred

because of sex, race, national origin, or some other protected class.")  But assuming that the

plaintiff did make such a complaint to the Secretary, the plaintiff has not pointed to any evidence

that the Appeal Panel, or anyone else at the International, for that matter, was aware of his filing

with the Secretary at the time that the Appeal Panel ruled on Carden's protest.  Such lack of

knowledge precludes a finding of causation between the protected activity and the adverse action.

*See Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261, 1278 (11th Cir. 2008); *Sullivan v. National

R.R. Passenger Corp.*, 170 F.3d 1056, 1059-60 (11th Cir. 1999).  The court concludes that the

plaintiff has failed to make out a prima facie case of retaliation under Title VII or § 1981 and that

the defendants are entitled to summary judgment on these claims.[46]

---

[46]Even if the plaintiff had made out a prima facie case of retaliation regarding the International's action, the
International is entitled to summary judgment on the additional ground that the plaintiff has failed to present sufficient evidence
to indicate that the reasons offered as the basis for the Appeal Panel's ruling on Carden's appeal are a pretext, as discussed in the
text in connection with the plaintiff's Title VII & § 1981 claims alleging unlawful race discrimination.

57

C.     **The Claims Under Title I and Title VI of the LMRDA**

The plaintiff has claimed that his removal from office as Grievance Chairman also violates Titles I and VI of the LMRDA.  More specifically, he asserts in Counts I and III of the complaint that his rights under the "equal rights" and "free speech" provisions of the Act, §§ 101(a)(1) and (a)(2), 29 U.S.C. §§ 411(a)(1) and (a)(2), respectively, have been infringed and that he was subjected to discipline in violation of § 101(a)(5) under Title I, 29 U.S.C. § 411(a)(5), and § 609 of Title VI, 29 U.S.C. § 529.  The defendants have moved for summary judgment on all such claims.

1.     **The Claims Against the Individual Defendants**

Perry, Evans and Irwin have moved for summary judgment on the LMRDA claims on the asserted ground that the "LMRDA does not create a right of action against Union officials in their individual capacity."  (Dfts. Evans & Irwin Summ. J. Brief at 2; *see also* Memorandum in Support of Defendant Danny Perry's Motion for Summary Judgment[47] ("Dft. Perry's Summ. J. Brief") at 1).  In support of this proposition, they cite one case: *Berg v. Watson*, 417 F. Supp. 806 (S.D.N.Y. 1976).  However, in that case, the district court there actually recognized that the LMRDA provides for a right to sue individual union officials "where, acting under color of and in abuse of their authority . . . , they violate the protected rights of union members."  *Id.*, 417 F. Supp. at 812.  More importantly, the Fifth Circuit has held in a binding decision that 29 U.S.C. § 102 "extends the jurisdiction of the district court to suits against individual union officials who, acting under color of their union authority, violate the [Title I] rights of union members" and "that, where the evidence shows that the defendants were agents of the union acting abusively

_____

[47]Defendant Perry's Summary Judgment Brief is doc. 40.

within the scope of their union duties, damages [can] be assessed against them individually,"
subject to a defense that "they have acted within their official capacities and in a good faith effort
to discharge their official duties." *Keene v. International Union of Operating Engineers, Local*
*624, AFL-CIO*, 569 F.2d 1375, 1381 & n.7 (5th Cir. 1978); *see also Schermerhorn v. Local 100,*
*Transport Workers Union of Amer.*, AFL-CIO  91 F.3d 316, 324 (2d Cir. 1996) ("[A] union
official who aids abets, instigates, or directs a wrongful use of union power to deprive a member
of his rights under § 101 [of the LMRDA] may be held liable under § 102[.]" (quoting *Rosario v.*
*Amalgamated Ladies' Garment Cutters' Union, Local 10*, 605 F.2d 1228, 1246-47 (2d Cir.
1979)).  Accordingly, the individual defendants are not entitled to summary judgment on the
basis that the LMRDA affords a blanket exemption to individual liability for union officials.[48]

## 2.  The Title I "Equal Rights" Claims

The plaintiff maintains that his removal from elected union office because of race violates
§ 101(a)(1), which states:

> **Equal Rights** – Every member of a labor organization shall have equal rights and
> privileges within such organization to nominate candidates, to vote in elections or
> referendums of the labor organization, to attend membership meetings, and to
> participate in the deliberations and voting upon the business of such meetings,
> subject to reasonable rules and regulations in such organization's constitution and
> bylaws.

29 U.S.C. § 411(a)(1).  The plaintiff maintains that he can prevail on his claims under this
section based upon a showing that his removal from union office was based upon race or that

---

[48]In their reply brief, Evans and Irwin additionally argue for the first time that they are entitled to summary judgment
on the LMRDA claims on the ground that there allegedly "is not any evidence that these individuals played any role in [the]
decision" to discharge the plaintiff from office.  (Evans & Irwins's Reply, Doc. 63, at 2).  However, this argument is untimely as
it is raised for the first time in a reply brief.  *Carter, supra*.  Moreover, as the court has previously discussed, the individual
defendants have not presented evidence regarding their lack of involvement or unlawful motives with respect to the Local
Executive Board's removal of the plaintiff in the August 2006 so as to entitle them to summary judgment on that basis.

such action was inconsistent with the union bylaws or constitution.  The defendants argue, however, that § 101(a)(1) pertains only to the rights of union members to nominate and vote, and they point out that the plaintiff undisputedly has been allowed to nominate and vote on equal terms with other members of the union.

Section 101(a)(1) is sometimes referred to as the "equal rights" provision of Title I.  *See, e.g., Dolan*, 746 F.2d at 737; *Fulk v. United Transp. Union*, 81 F.3d 733, 734 (7th Cir. 1996).  Such a moniker might tend to connote a right of broad-spectrum of equal treatment by unions akin to the scope of protections afforded by the Equal Protection Clause relative to government action.  However, the Eleventh Circuit has cautioned that the "'Bill of Rights of Members of Labor Organizations' [in § 101(a)] confers specific rights that are more limited than their shorthand names . . . might suggest."  *Dolan*, 746 F.2d at 740.  Section 101(a)(1) would prohibit unions from taking at least some actions against their members because of race.  *See Alvey v. General Elec. Co.*, 622 F.2d 1279, 1286 (7th Cir. 1980) (stating that a rule that prohibited members from voting in union elections "based on race, sex or religion" would be "improper" under § 101(a)(1)).  However, § 101(a)(1) does not prohibit all conduct by labor unions that might be said to be racially or otherwise unfairly discriminatory.  *See Gavin v. Structural Iron Workers Local No. 1*, 553 F.2d 28, 30 & n.1 (7th Cir. 1977) (holding that Title I did not afford a basis for relief to plaintiffs claiming they were being denied union membership because of race); *see also* B. Aaron, *The Labor-Management Reporting and Disclosure Act of 1959*, 73 Harv. L. Rev., 851, 860-61 (March 1960) (discussing Congress's rejection of the "Powell Amendment" offered during debate on the LMRDA, which had it passed, would have forbidden labor organizations to "refuse membership to any person on the grounds of race, religion, color, sex or

60

national origin.")  Also, "[s]ection 411(a)(1) was not designed to grant federal courts 'jurisdiction

to enforce union constitutions and by-laws across the board.'"  *Nienaber v. Ohio Valley*

*Carpenters Dist. Council*, 652 F.2d 1284, 1286 (6th Cir. 1981) (quoting *Bunz v. Moving Picture*

*Mach. Operators' Protective Union*, 567 F.2d 1117, 1121 n.17 (D.C. Cir. 1977)).  A union's

violation of its own constitution or bylaws is not a per se violation of the LMRDA; a plaintiff

must show that a violation of internal union laws actually infringes rights protected by a

provision of Title I.  *See Adams-Lundy v. Association of Professional Flight Attendants*, 792 F.2d

1368, 1372-73 (5th Cir. 1986); *Nienaber*, 652 F.2d at 1286; *Bunz*, 567 F.2d at 1121.

    The question here is whether § 101(a)(1) protects specifically against the removal of an

elected union official.  On its face, the statutory language does not prohibit such an act.  Rather, it

guarantees "equal rights and privileges" only "to nominate candidates, to vote in elections or

referendums ..., to attend membership meetings, and to participate in the deliberations and voting

upon the business of such meetings . . . ."  Courts have generally interpreted the scope of

§ 101(a)(1) narrowly, as protecting only the rights specifically enumerated.  In *Calhoon*, for

example, the Supreme Court was faced with claims alleging infringement of rights under

§ 101(a)(1) based upon restrictions on the ability of union members to nominate themselves or

other candidates of their choice for union office, in that bylaws of their local deprived a member

of the right to nominate anyone for office but himself, while the national constitution restricted

eligibility for office to those with a certain amount of time as a member of the national union and

with certain other service qualifications.  *See* 379 U.S. at 136.  The Court characterized such

claims as "basically relating . . . to eligibility of candidates for office," and, as such, they could

not be maintained as a violation of nominating or voting rights protected under § 101(a)(1).  *Id.*

61

at 141.  The Court recognized that "Title IV, not Title I, sets standards for eligibility and qualifications of candidates and officials."  379 U.S. at 138; *see also* § 401(e) of the Act, 29 U.S.C. § 481(e)[49]; *Department of Labor v. Aluminum, Brick and Glass Workers Intern. Union, Local 200*, 941 F.2d 1172, 1178-79 (11th Cir. 1991) (suggesting that the "right to vote and the right to run for and hold union office . . . derive from separate sections of the labor code").  Further, the Court held that jurisdiction "depend[ed] entirely upon whether [the] complaint showed a violation of rights guaranteed by § 101(a)(1)," 379 U.S. at 138, and that "possible violations of Title IV of the Act regarding eligibility are not relevant in determining whether or not a district court has jurisdiction under . . . Title I of the Act."  *Id.* at 139-40.  With regard to whether the plaintiffs' allegations made out a claim for infringement of Title I rights, the Court stated:

> [T]he equal-rights language of § 101(a)(1) would have to be stretched far beyond its normal meaning to hold that it guarantees members not just a right to 'nominate candidates,' but a right to nominate anyone, without regard to valid union rules . . . .  Plainly, [§ 101(a)(1)] is no more than a command that members and classes of members shall not be discriminated against in their right to nominate and vote.

379 U.S. at 139.  The Court acknowledged that the plaintiffs

> were denied their request to be candidates, but that denial was not a discrimination against their right to nominate, since the same qualifications were required equally of all members.  Whether the eligibility requirements set by the union's constitution and bylaws were reasonable and valid is a question separate and

---

[49]29 U.S.C.A. § 481(e) provides in relevant part:

(e) Nomination of candidates; eligibility; notice of election; voting rights; counting and publication of results; preservation of ballots and records

In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 of this title and to reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof.

> distinct from whether the right to nominate on an equal basis given by § 101(a)(1)
> was violated.

379 U.S. at 139.  Following *Calhoon*, the lower federal courts have held that allegations

pertaining to the right of a person to serve as a candidate or an elected union official are not

viable Title I claims because they fundamentally concern eligibility qualifications, rather than

nominating or voting rights.  *See Gilvin v. Fire*, 259 F.3d 749, 760-761 (D.C. Cir. 2001) (holding

that the plaintiff's suspension from union office did not show that he was "deprived of any of the

specific rights protected by § 101(a)(1)"); *Adams-Lundy v. Association of Professional Flight*

*Attendants*, 731 F.2d 1154, 1159 (5th Cir. 1984) (rejecting the plaintiff's argument "that the

removal of an elected officer infringes on the membership's right, guaranteed by § 101(a)(1), to

elect its chosen representatives, and not to have its electorally-expressed will thwarted by

parliamentary machinations . . . because the challenged action is not the type of direct

interference with voting privileges comprehended by the Act."); *Lux v. Blackman*, 546 F.2d 713,

716 (7th Cir. 1976) ("Section 411(a)(1) speaks to those rights to nominate and to vote on equal

terms among union members, subject to 'reasonable rules and regulations' of the organization.

The statute has nothing to do with the removal of officers, regardless of the nonregularity of their

removal."); *Hofmann v. Schaefer*, 648 F.2d 934, 935 (4th Cir. 1981) ("Because Hofmann's claim

is one basically relating to his eligibility as a candidate for union office, it is, under the holding in

*Calhoon*, a claim properly addressed to the Secretary under Title IV rather than the courts under

Title I."); *Pruitt v. United Broth. of Carpenters and Joiners of Amer.*, 518 F. Supp. 61, 62 (N.D.

Ga. 1981) ("Although the plaintiff alleges that certain rights have been violated under Title I,

these putative violations are all based on Pressley's eligibility to hold an elective office.")

The plaintiff does not dispute that he was not prevented from attending meetings, nominating, or voting. Rather, his claims here are based solely upon his removal from elected union office. Under *Calhoon* and its progeny cited above, these claims are fundamentally directed at issues of eligibility and qualification for office. As such, they are not cognizable as Title I claims because they do not allege infringement of any of the specific rights guaranteed by § 101(a)(1).[50]

The plaintiff argues, however, that "the United States Supreme Court has held that the discriminatory application of union rules violates § 101 of the LMRDA." (Pl. Brief in Opp. to Union Dfts. Summ. J. Mot. at 24). For this proposition he cites *Local No. 82, Furniture and Piano Moving, Furniture Store Drivers, Helpers, Warehousemen and Packers v. Crowley*, 467 U.S. 526 (1984). The plaintiff reads *Crowley* too broadly. The plaintiff's pinpoint cite is to a portion of the opinion that is merely relating rulings made by the courts below, not setting forth the analysis or holding of the Supreme Court. *See* 467 U.S. at 532 ("Nonetheless, the [district] court noted that federal court jurisdiction was available under § 102 of Title I, 29 U.S.C. § 412, for claims alleging discriminatory application of union rules."). But even insofar as the Supreme Court or the lower courts found a "discriminatory application of union rules" as affording a basis for jurisdiction under Title I in *Crowley*, such discrimination was in the union's enforcement of a requirement whereby union members were *excluded from a meeting to nominate candidates* for the local executive board unless they could produce a computerized receipt showing that their

---

[50]There can be no doubt that a union violates Title IV if it considers race as an eligibility qualification for union officer positions. *See Donovan v. Illinois Educ. Ass'n*, 667 F.2d 638, 640-42 (7th Cir. 1982); *Schultz v. Local 1291, Intern. Longshoremen's Ass'n*, 338 F. Supp. 1204, 1207 (E.D. Pa.), *aff'd sub nom Hodgson v. Local 1291, Intern. Longshoremen's Ass'n*, 461 F.2d 1262 (3d 1972); *see also Tucker v. Tobacco Workers Intern. Union, AFL-CIO, Local 183*, 488 F.2d 76 (4th Cir. 1973). However, as already explained, the plaintiff cannot pursue Title IV claims in this court, nor can his Title I claims be premised in whole or in part upon violations of Title IV rights. *See Calhoon*, 379 U.S. at 138-40.

dues had been paid up to date.  *See* 467 U.S. at 529 & 533 n.7.  Accordingly, the discrimination complained of impinged directly upon rights of members to attend meetings and nominate candidates for office, core rights expressly guaranteed under §§ 101(a)(1).  Thus, *Crowley* does not hold or suggest that any "discriminatory application of union rules" is cognizable as a violation of § 101(a)(1).  The court concludes that the defendants are entitled to summary judgment on the plaintiff's claims based upon LMRDA § 101(a)(1).

## 2.      The Title I "Free Speech" Claims

The defendants have argued that they are also entitled to summary judgment on the plaintiff's claims alleging infringement of his rights under the "free speech" provision of Title I contained in § 101(a)(2) of the Act.  That section states in relevant part:

> **Freedom of speech and assembly** – Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings.

29 U.S.C. § 411(a)(2).  The plaintiff argues that he can prove a violation of this section based upon evidence that he was removed from his elected position as Grievance Chairman "because he is outspoken."[51]  (Pl. Brief in Opp. to Union Dfts. Summ. J. Mot. at 22-23).  In order to prevail

---

[51]The plaintiff additionally suggests that he might prove a Title I free speech violation based upon a showing that his removal from union office was racially motivated.  (Pl. Brief in Opp. to Union Dfts. Summ. J. Mot. at 22-23).  The plaintiff's theory on such a claim is that "the removal of a union member because of race violations § 101 of the LMRDA, because its (sic) improperly chills the free speech rights of a person because of his or her race."  (*Id.* at 23).  Indeed, the plaintiff goes so far as to suggest that any "wrongful removal of a person from elected office" violates free speech rights under Title I, on the premise that such removal "has a chilling effect on . . . Title I free speech rights [both of the person removed and] . . . the members who voted for him."  (*Id.* at 22).  In support of this line of argument, the plaintiff relies exclusively upon *Sheet Metal Workers Int'l Ass'n v. Lynn*, 488 U.S. 347 (1989).  His reliance, however, is misplaced.  *Lynn*, which the court further discusses in the text below, is a traditional free speech retaliation claim, based upon an allegation that the plaintiff there was removed from elected union office as a result of his having engaged in *protected expression*, namely, opposition at a union meeting to a proposed dues increase.  *See* 488 U.S. at 349-350.  *Lynn* did not involve a claim of race discrimination, nor was there any suggestion that any removal of an elected union official, *in itself*, implicates Title I free speech rights.  On its face, § 101(a)(2) protects the rights of union members to engage in "speech," "assembly," and similar activity; it does not protect against race discrimination nor broadly against

on such a Title I free speech retaliation claim, the plaintiff has the burden at trial to prove the following:

> (1) [that the plaintiff's] conduct constituted an exercise of free speech protected by the LMRDA; (2) [that the plaintiff was] subject to an adverse action; and (3) the adverse action was causally connected to the exercise of protected free speech.

*Carroll v. International Ass'n of Machinists & Aerospace Workers*, 2006 WL 4401479 (N.D. Ga. 2006) (citing *Black v. Ryder/P.I.E. Nationwide, Inc.*, 970 F.2d 1461, 1469 (6th Cir.1992); *Williams v. United Steel Workers of Amer.*, 234 F. Supp. 2d 542, 549 (M.D.N.C. 2002); *Milne v. Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 156 F. Supp. 2d 172, 182 (D. Conn. 2001); *Kauffman v. International Brotherhood of Elec. Workers*, 124 F. Supp.2d 1127, 1131 (N.D. Ill. 2000)).

The lone argument made by the union defendants in their summary judgment brief on the merits of this claim is, in its entirety, as follows:

> Nor is there any evidence in this case that any action taken by the Unions violated [the plaintiff's] freedom of speech or freedom of assembly as alleged by Plaintiff in Count III. Union members are afforded the rights of free speech and assembly by 29 U.S.C. Section 411(a)(2). Jackson testified in his deposition that he was allowed to attend Union meetings and that he was allowed to speak at Union meetings. (Jackson Dep., p. 25, 1.20 - p. 26, 1.12).

(Union Dfts. Summ. J. Brief at 22). This defendants' argument goes to the second, "adverse action" element of a prima facie case. In short, the defendants take the position that § 101(a)(2) guarantees only that union members are able to attend and speak at union meetings and that because the plaintiff admits that he was not prevented from doing either, he has no viable claim

---

removal from union office for any reason that might be deemed "wrongful" or "unfair." *Cf. Banks v. United States*, 2007 WL 1030326, *7 (E.D. La. 2007) (unpublished) ("[T]he plaintiff alleges economic and racial discrimination by the defendants under the First Amendment. However, the First Amendment does not provide a basis for an equal protection claim.").

based upon his removal from office.

The Supreme Court rejected a similar argument in *Sheet Metal Workers Int'l Ass'n v. Lynn*, 488 U.S. 347 (1989).  The plaintiff there, Lynn, asserted a claim for infringement of his Title I free speech rights based upon his removal from an elected office as a local union business representative shortly after he expressed opposition at a meeting to a proposed dues increase. 488 U.S. at 349-350.  In analyzing the claim, the Court related:

> Petitioners argue that Lynn's Title I rights were not "infringed" for purposes of § 102 because Lynn, like other members of the Local, was not prevented from attending the special meeting, expressing his views on Hawkins' dues proposal, or casting his vote, and because he remains a member of the Local. Under this view, Lynn's status as an elected, rather than an appointed, official is essentially immaterial and the loss of union employment cannot amount to a Title I violation.

*Lynn*, 488 U.S. 353-54.  The Court found this argument to be "unpersuasive, " explaining, "[g]iven that Lynn was removed from his post as a direct result of his decision to express disagreement with Hawkins' dues proposal at the special meeting, and that his removal presumably discouraged him from speaking out in the future, Lynn paid a price for the exercise of his membership rights."  *Id.*, 488 U.S. at 354.  In a prior decision, the Court had held that the termination of an *appointed* union official by a newly elected union president in retaliation for the appointee's support of his incumbent rival did not violate § 101(a)(2).  *See Finnegan, supra*. The *Lynn* Court concluded, however, that the retaliatory removal of an *elected* official was different, because only the latter situation truly undercuts "the LMRDA's basic objective: 'to ensure that unions [are] democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections."  *Lynn*, 488 U.S. at 354 (quoting Finnegan, 456 U.S. at 441).  More specifically, the Court reasoned that removal of an appointed official for

67

presumed disloyalty actually furthered democratic objectives insofar as the appointee was in a position potentially to thwart the implementation of the newly-elected president's programs. *Id.*, 488 U.S. at 354-55. By contrast, "when an elected official like Lynn is removed from his post, the union members are denied the representative of their choice," 488 U.S. at 355, and it also has a "more pronounced . . . potential chilling effect on Title I free speech rights" of both the removed official and "the members who voted for him." *Id.*

The defendants reply that *Lynn* is inapposite. (Union Dfts. Reply at 6-7). They say that the Supreme Court's concern there "was that if a Union could discharge an elected business agent, the vote of the members would be nullified." (*Id.* at 6). The defendants emphasize that the plaintiff undisputedly received *fewer* votes than did Carden, the person installed in the position following the plaintiff's ouster. So allowing the plaintiff's Title I free speech claims to stand, the defendants contend, would not advance the democratic principles enforced in *Lynn* but would, rather, tend to frustrate the democratically expressed will of the membership.

The court acknowledges that the unique circumstances involved in plaintiff's election and removal, followed by the immediate installation of the candidate who received the most votes, do not tip as clear a balance relative to the impediment of democratic values underlying the LMRDA as did the discharge in *Lynn*. Most obviously, because this plaintiff received fewer votes than Carden, it cannot as easily be said that "the union members are denied the representative of their choice." *Lynn*, 488 U.S. at 355. However, the court does not believe that this difference sufficiently alters the calculus to take the case outside the core holding of *Lynn*: that the removal of an elected union official by other union officials in retaliation for engaging in protected speech is actionable as a violation of § 101(a)(2). Insofar as the plaintiff was removed

68

from an "elected" office rather than a patronage appointment, the case is still closer to *Lynn* than to *Finnegan*. Further, the democratic principles underlying the LMRDA do not prohibit all restrictions on candidate eligibility, thus belying any notion of an untrammeled right of union members to elect anyone of their choosing. *See Local 3489, United Steelworkers of Amer., AFL-CIO v. Usery*, 439 U.S. 305, 308-09 (1977); *Calhoon*, 379 U.S. at 138. Accordingly, the plaintiff's removal undercuts democratic principles insofar as it may be argued, as the plaintiff does, that the plaintiff was elected based upon having received the most votes among the candidates eligible to serve, based upon established union rules and practice. Nor is there any issue here, unlike in *Finnegan*, of a disloyal patronage appointee's ability to thwart the implementation of policy favored by elected union officials. *See generally Finnegan*, 456 U.S. at 441 n.11 (leaving open whether a nonpolicymaking and nonconfidential employee discharged for political reasons might pursue a Title I free speech claim). The court concludes that the plaintiff's removal from elected office is an adverse action capable of supporting a Title I free speech claim.

Because the defendants have not challenged the other elements of the plaintiff's prima facie case on these claims, the court will not consider them. *See Imaging Business Machines, LLC v. BancTec, Inc.*, 459 F.3d 1186, 1191 (11th Cir. 2006); *Washburn v. Harvey*, 504 F.3d 505, 510 (5th Cir. 2007). However, the court concludes that the *McDonnell Douglas* burden-shifting framework is applicable to these claims, which are based only upon circumstantial evidence. *See Casumpang v. International Longshoremen's and Warehousemen's Union, Local 142*, 269 F.3d 1042, 1058-59 (9th Cir. 2001). Further, the court concludes that the International has clearly and sufficiently argued that it is entitled to summary judgment on all claims alleging an unlawful

69

motivation in connection with the Appeal Panel's ruling on Carden's protest, because such body reached its ruling for legitimate reasons that the plaintiff cannot show are pretextual.  Based upon the court's pretext discussion relative to the plaintiff's Title VII / § 1981 claims, the court agrees with the International.  Accordingly, the International is entitled to summary judgment on these claims.  However, as the court has also previously discussed, because none of the other defendants have sought to explain their involvement or motives in connection with the Local Executive Board's vote to remove the plaintiff from office in August 2006, the court concludes that the Local and the individual defendants are not entitled to summary judgment on these claims.

### 3.      The Title I and Title VI "Discipline" Claims

The plaintiff has alleged that his removal from office constituted unlawful discipline in violation of § 101(a)(5) of Title I of the LMRDA, which provides that,

> No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization ... unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

29 U.S.C. § 411(a)(5).  The plaintiff similarly contends that he might recover under § 609 of Title VI of the LMRDA, which makes it

> unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of [the LMRDA].

29 U.S.C.A. § 529.  The defendants argue that they are entitled to summary judgment on these claims on the basis that the plaintiff's removal from office as Grievance Chairman does not qualify as "discipline" within the meaning of these statutes.  The court agrees.

70

Section 101(a)(5) does not "guarantee any protections as far as removal of a union member from his post as an officer or employee of the union." *Dolan v. Transport Workers Union of America*, 746 F.2d 733, 740 (11th Cir. 1984); *see also Rutledge v. Aluminum, Brick and Clay Workers Intern. Union*, 681 F.2d 1352, 1354 (11th Cir. 1982); *Blacksmiths, Forgers and Helpers, AFL-CIO*, 755 F.2d 866, 869 (11th Cir. 1985) ("The word 'discipline' refers only to a retaliatory act that would affect a union member's rights or status as a *member* of the union." (emphasis original)); *Finnegan*, 456 U.S. at 438 (the "prohibition [in § 101(a)(5)] on suspension without observing certain safeguards applies only to suspension of membership in the union; *it does not refer to suspension of a member's status as an officer of the union*" (quoting Conference Report accompanying S. 1555 as finally enacted, H.R. Conf. Rep. No. 1147, 86th Cong., 1st Sess., 31 (1959), 1 Leg. Hist. 935 (emphasis in *Finnegan*)). Further, the phrase 'otherwise disciplin[e]' appears in both § 101(a)(5) and 609, and "it has the same meaning in both sections." *Breininger v. Sheet Metal Workers Intern. Ass'n Local Union No. 6*, 493 U.S. 67, 90 n.13 (1989) (citing *Finnegan*, 456 U.S. at 439, n. 9). Accordingly, the court concludes that the plaintiff's claims alleging improper discipline under §§ 101(a)(5) and 609 are due to be dismissed on summary judgment.

### D.    Duty of Fair Representation

The defendants have moved for summary judgment on the plaintiff's claims alleging breach of the duty of fair representation, set forth in Count II of the complaint. The plaintiff asserts that the union defendants breached that duty based upon their removing him from office as the Grievance Chairman, by allegedly changing the procedures for electing the Grievance Chairman after he was elected, and by refusing to hear or pursue his internal complaint relating

71

his ouster and the alleged changes worked in election procedures.

Claims for breach of the duty of fair representation arise under the National Labor Relations Act ("NLRA"), 49 Stat. 449, as amended, 20 U.S.C. §§ 151 et seq.  *See United Steelworkers of Amer., AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 372 (1990); *Breininger,* 493 U.S. at 73.  The Supreme Court has explained the underpinnings of the duty of fair representation thus:

> When a labor organization has been selected as the exclusive representative of the employees in a bargaining unit, it has a duty, implied from its status under § 9(a) of the NLRA as the exclusive representative of the employees in the unit, to represent all members fairly. *See, e.g., Ford Motor Co. v. Huffman*, 345 U.S. 330, 337 (1953); *Vaca v. Sipes*, 386 U.S. 171, 177 (1967).  As we described this duty in *Vaca v. Sipes*, the duty of fair representation requires a union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Ibid.*  In other words, a union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith. *Id.*, at 190.

*Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998).  "This duty on the part of the union, however, does not permit federal court review of all of the union's internal affairs." *Hester v. International Union of Operating Engineers*, 830 F.2d 172, 175 (11th Cir. 1987), *vacated*, 488 U.S. 1025, *reaffirmed in relevant part on remand*, 878 F.2d 1309, 1310 (11th Cir. 1989).  "Because the [duty of fair representation] is imposed on the union as a result of its position as exclusive bargaining representative, it applies only to union conduct arising from the union's position as representative." *Id.* (quoting *Bass v. International Brotherhood of Boilermakers*, 630 F.2d 1058, 1062 (5th Cir. 1980)).  "Therefore, union conduct that affects only an individual's relationship within the union structure is not circumscribed by the constraints of the [duty of fair representation]." *Bass*, 630 F.2d at 1063; *see also Smith v. Babcock & Wilcox*

*Co., Refractories Div., Augusta, Ga.*, 726 F.2d 1562, 1566 (11th Cir. 1984).

The defendants contend that the plaintiff's allegations are not cognizable as fair-representation claims because they relate exclusively to the dispute over the Grievance Chairman election, which, they say, is an internal union affair.  The court agrees.   The plaintiff urges that the dispute over his right to hold office is not an internal union matter because the CBA references the Grievance Chairman position, sets the number of Grievance Committee members, and requires the employer to approve the number of committee members.  He also says that U.S. Steel as the employer breached the CBA by "agreeing retroactively allow the defendants to increase the number of Grievance Committeemen from 3 to 4."  (Pl. Brief in Opp. to Union Dfts. Summ. J. Mot. at 35).  However, the plaintiff has failed to demonstrate that the CBA was actually breached by the change in the number of Grievance Committee members or how such change itself adversely affected him or that the union acted arbitrarily, discriminatory, or in bad faith within the meaning of the duty of fair representation.  Ultimately, whether the plaintiff was entitled to hold the Grievance Chairman office concerns only the plaintiff's relationship within the union structure and not any aspect of his employment, notwithstanding references to the Grievance Chairman position in the CBA.  As such, the court concludes that the defendants are entitled to summary judgment on the plaintiff's claims alleging a breach of the duty of fair representation.[52]  *See Strickland v. National Ass'n of Gov't Employees*, 134 F.3d 379 (table), 1998 WL 22020 (9th Cir. 1998) (holding that a union's action of removing of its own official was an internal union matter and thus did not breach the duty of fair representation, citing *Bass,*

---

[52]The individual defendants' are also entitled to summary judgment on the additional ground that individual union officials cannot be liable to pay damages on claims alleging breach of the duty of fair representation.  *See Morris v. Local 819, Intern. Broth. of Teamsters*, 169 F.3d 782, 784 (2d Cir. 1999); *Carter v. Smith Food King*, 765 F.2d 916, 920-21 (9th Cir. 1985).

*supra*).

**E.     Claims for Breach of Union Constitution and Bylaws - § 301 of the LMRA**

The union defendants have also moved for summary judgment on claims in Count II

alleging breach of the union constitution and bylaws, brought pursuant to § 301 of the LMRA.

(*See* Union Dfts. Summ. J. Brief at 27-28; Compl., Count II heading & ¶ 47).  Section 301(a)

authorizes federal district courts to hear "[s]uits for violation of contracts between an employer

and a labor organization representing employees in an industry affecting commerce as defined in

this chapter, or between any such labor organizations," 29 U.S.C.A. § 185(a).  Contract claims

that are cognizable under § 301(a) arise under, and are governed by, federal law.  *Pruitt v.*

*Carpenters' Local Union No. 225*, 893 F.2d 1216, 1219 (11th Cir. 1990); *Local 472 of United*

*Ass'n of Journeymen and Apprentices of Plumbing and Pipefitting Industry of U.S. and Canada*

*v. Georgia Power Co.*, 684 F.2d 721, 725 (11th Cir. 1982).  The jurisdiction conferred by §

301(a) extends to suits on union constitutions brought by individual members of a union.  *See*

*Wooddell v. International Broth. of Elec. Workers, Local 71*, 502 U.S. 93, 103 (1991); *Pruitt*,

893 F.2d at 1219.

The individual defendants have asserted that they are entitled to summary judgment on

these claims because individual liability is not authorized by law.  The court agrees that, to the

extent the plaintiff has sought to recover against the individual defendants for breach of the union

constitution or bylaws, such claims for damages as those brought here are not viable under § 301

of the LMRA.  *See Madden v. International Ass'n of Heat and Frost Insulators and Asbestos*

*Workers*, 889 F. Supp. 707, 711-13 (S.D.N.Y. 1995).

The International contends that it is entitled to summary judgment on the plaintiff's claim

74

alleging that it breached the terms of its constitution in connection with the International's ruling

in Carden's favor on his protest, which effectively extinguished any right of the plaintiff to hold

the Grievance Chairman position for the remainder of its term.  The court has largely already

addressed the issues relevant to this claim in connection with the analysis of the plaintiff's

various attempts to show that the legitimate reasons offered by the International for its ruling on

Carden's protest are a pretext to hide an unlawful animus under Title VII and § 1981.  In short, as

the court explained there, the plaintiff simply cannot show that there is any provision of the

International Constitution that provides that a candidate must win an area grievance

committeeman race in order to be eligible to serve as the chairman of such a committee.  At best,

the plaintiff can point to gaps and ambiguities that might possibly have allowed the International

to reach an interpretation he favors.  However, it is well established that a union's interpretation

of its own constitution and bylaws is entitled to deference and will be respected unless it is

contrary to the plain language of the relevant document or is otherwise patently unreasonable.

*See Department of Labor v. Aluminum, Brick and Glass Workers Intern. Union, Local 200*, 941

F.2d 1172, 1177 (11th Cir. 1991); *Local 317, National Post Office Mail Handlers v. National

Post Office Mail Handlers*, 696 F.2d 1300, 1302 (11th Cir. 1983).  Further, "[t]he proper inquiry

has been described as 'whether there was arguable authority for the [union's] act from the [union

decisionmaker's] viewpoint at the time, not from a court's more sophisticated hindsight.'"

*Executive Bd. of Transport Workers Union of Philadelphia, Local 234 v. Transport Workers

Union of America, AFL-CIO*, 338 F.3d 166, 170 (3d Cir. 2003) (quoting *Stelling v. International

Bhd. of Elec. Workers*, 587 F.2d 1379, 1389 n. 10 (9th Cir. 1978) (citation omitted)).  Thus, "a

court should defer to a reasonable interpretation even if the court finds the provisions in question

are 'ambiguous.'" *Felton v. Ullman*, 629 F. Supp. 251, 255 (S.D.N.Y. 1986). The court

concludes that the International is entitled to summary judgment on this claim.

The action of the Local, however, by which the plaintiff was actually removed from office

in August 2006 pursuant to a vote of its Executive Board, presents another matter. As the court

has explained, none of the defendants, including the individual defendants who were members of

the Executive Board at the relevant time, have sought to explain anything about the basis for, or

the motivation underlying, the decision-making process for that action. Indeed, it is questionable

whether it can be said that the Local or the individual defendants can be said to have properly

moved for summary judgment on this claim. Further, the Elections Manual expressly states that

when there has been a protest of a local union election to the International Executive Board, the

"Local Union action shall remain in effect unless stayed, set aside or modified by action of the

International Executive Board." (Elections Manual at 45). At the time the plaintiff was removed

by the Local Executive Board, however, Carden's appeal of the election to the International was

still pending. The court concludes that the Local has failed to demonstrate that it is entitled to

summary judgment on this claim.

### 5. Defamation

All defendants have moved for summary judgment on the plaintiff's claims alleging

defamation under Alabama law. The plaintiff states that he did not intend to assert defamation

claims against defendants Irwin or Evans (Pl. Brief in Opp. to Irwin & Evans Summ. J. Mot. at

6), and he also agrees to the dismissal of his defamation claims against the union defendants. (Pl.

Brief in Opp. to Union Dfts. Summ. J. Mot. at 35). Accordingly, summary judgment is due to be

granted on such claims. This leaves remaining only the defamation claims against defendant

76

Perry, which the plaintiff maintains are viable.  These claims are predicated upon statements

allegedly made by Perry about the plaintiff, as related by the testimony of three witnesses:

Richard Leach, Demetrius Reynolds, and Randall Harris.

Leach, like Perry, was an elected trustee of the Local, and in that capacity they both sat on

the Locals Executive Board that voted in August 2006 to remove the plaintiff as the Grievance

Chairman.  Leach testified regarding statements allegedly made by Perry at two different times.

He first testified that, in the period after the plaintiff was initially declared the winner of the

Grievance Chairman race by the Local Election Committee, he heard Perry and several other

individuals make statements about the plaintiff, occurring in informal conversations "like before

a [union] meeting," while people "would be hanging around the hall."  (Leach Dep. at 26).  With

regard to Perry's statements in this context, Leach testified as follows:

> Q.     Okay.  Tell me about the racial slurs that Danny Perry made about [the
> plaintiff].
>
> A.     That he believed [the plaintiff] was a racist because he would only stand
> up for black people.  If he was nominated in that position, he would only
> stand up for black people and that – I can't –  I can't remember.  I can't
> remember how he worded it, but it was – it was the –  to the fact that he
> was a radical and that he would only stand up for his own race.

(Leach Dep. at 24-25).  Leach also testified about another conversation in which Perry made

statements regarding the plaintiff's alleged misuse or suspected misuse of union funds:

> Q.     Let me ask you this: have you heard members of [the Local] claim that
> [the plaintiff] embezzled money belonging to the Union?
>
> A.     Not embezzled.
>
> Q.     Okay.
>
> A.     I heard there was money issues where that – the term "embezzled" wasn't

used.  It was he was misusing funds.  He was taking off on Union business too often and using up Union funds.

Q.     Okay.  Now, where did you hear that at?

A.     It was brought up by Keith Taylor [the Financial Secretary of the Local] and Danny Perry.  Part of our trustee's job is to go over the record books, and we had to go over all the claims for lost time.

Q.     Okay.

A.     And it was brought to my attention by Keith Taylor and Danny Perry.

Q.     So they claimed that he was misappropriating funds.

         MR. RUOCO [Defense counsel]: Object to the form.

Q.     You can answer.

A.     Yes.

Q.     Okay.

A.     Let me rephrase –

Q.     Go ahead.

A.     They didn't claim that he was doing [it].  They suspected him of doing it.

(Leach Dep. at 30-31).

Reynolds worked with the plaintiff in the cold reduction area of the plant.  He testified as

follows regarding a conversation he once had with Perry:

Q.     Okay.  And when did this conversation occur?

A.     I can't recall the date.

Q.     Okay.  Well, was it after the election?

A.     Yes.

78

Q.      And where were you when this conversation occurred?

A.      On the dual line.

Q.      Okay.  Was it during work, before work, after work?

A.      During work.

Q.      During work?  Okay.  And you work with Mr. Perry?

A.      No.  Well, I actually drive a tractor and at the time, he was on the entry end operating.

Q.      Okay.  So you were making a delivery to his operating area?

A.      Yes.

Q.      Okay.  And was there anybody there besides you and he?

A.      No, sir.

Q.      Okay.  Now, tell me what happened.

A.      Well, I was trying to locate a coil that I couldn't find, so I got down off my tractor and went in this little operating shack and asked him about the coil at first and then he had asked me was – was William [the plaintiff] at work and I told him no, he wasn't, he had been off a couple of days and he asked me was he serving a suspension or something.

Q.      Now, Mr. Perry asked you this question?

A.      Yes.

Q.      Is that correct? Okay.  And what did you say?

A.      I told him no, not that I know of and I asked him what – serving a suspension on what reason, and he said because of some union business stuff.

Q.      And did you ask him what union business?

A.      Yes.

79

Q.      And what did he say?

A.      He was saying like a lot of guys in the union.  He didn't – he called William's name and said people was taking off work on union business, but really wasn't conducting union business.

Q.      Did he –

A.      And he thought he was being served with a two-week disciplinary action or whatever.

Q.      Okay.  And did he mention William by name?

A.      Yes.

Q.      Okay.  Did he mention anybody else by name?

A.      No, sir.

Q.      What else did he say?

A.      He said he did some kind of audit, he had did (sic) an audit and found money that was missing from the union and he claimed these guys was basically robbing the company, taking off on union business and it wasn't no union business.

Q.      Was it your understanding – or it was your understanding based on what he was saying that there was more than one person involved?

A.      Yes.

Q.      It was William Jackson and some other individuals?

A.      Yes.

* * *

Q.      Did you ask him why the company would have suspended Mr. Jackson for something that occurred relating to the union?

A.      Yes, I did.

Q.      Okay, and what was his response?

A.      He just said guys have been robbing the company, said he was conducting an audit and found all this information out.

Q.      Did you ask him why he had been conducting an audit?

A.      No, sir.

Q.      And when he talked about the company, you understood that to be U.S. Steel?

A.      Yes.

Q.      And it was your understanding that this was an audit that Mr. Perry had conducted?  Is that correct?

A.      Yes.

(Reynolds Dep. at 26-31).

Harris, another a co-worker of the plaintiff's, reported what appears to have been the same or a similar conversation with Perry as the one related by Reynolds, as follows:

Q.      Okay.  Who was present when that conversation occurred?

A.      Demetrius Reynolds and other one of our co-workers . . . .

* * *

Q.      Okay.  Where were you when this conversation occurred?

A.      In my work area.  I work out of a recorder shack.

* * *

Q.      Okay.  Why was Mr. Perry in the shack?

A.      Well, down the dual line they bring a piece of paper up there to give to the tractor drivers letting them know what coils they're running, and he came in that day and brought the paperwork in to the tractor driver.

Q.      Okay.  And tell me, how did the conversation begin to the best of your recollection.

81

A.      He brought up did we hear about Billy Jack.  That's what we call William Jackson [the plaintiff], Billy Jack.

Q.      Okay.  And what did you say?

A.      I said he's off sick and then he went into detail saying they was doing an investigation on  – doing an audit and they was investigating William Jackson because he was doing – he was claiming union business, but – being paid by union pay, but wasn't doing union business.

Q.      Okay.  And in addition to Mr. Jackson, there were other people that were being audited too.  Is that correct?

A.      Well, he just said William Jackson.

Q.      Okay.  What exactly did he say to the best of your recollection?

A.      That he was being audited and being investigated on being out on union business, getting paid by the union when he wasn't doing union business and he was out on five day subject to discharge while they was (sic) doing the investigation.

* * *

Q.      Okay.  Do you remember when this conversation occurred?

A.      With Danny Perry?

Q.      Yes.

A.      I don't remember the dates, but I know it was sometime in August or something like that, I think.

* * *

Q.      Do you remember exactly what it was that Mr. Perry said?

A.      He said that while Billy – William Jackson was out – Billy Jack was out, he was being audited, he was being investigated for doing union business, claiming union pay – union business – union pay when he wasn't doing union business.

Q.      That he was being audited for that?

82

A.      He was being audited, they was doing an audit and he was being investigated.

Q.      Okay.  And did he tell you who was doing the audit or who was doing the –

A.      No, he didn't.  I mean, if he did, I don't remember who he said said it.

Q.      Did he tell you who was doing the investigation?

A.      I guess the union, but I don't remember if he told me who was doing the investigation or not.

Q.      Okay.  Did he indicate to you in that conversation that Mr. Jackson was mishandling union funds in any way?

A.      He just mentioned that they was (sic) doing an audit and they was investigating William Jackson for being out doing union – supposedly doing union business which he wasn't and he was getting paid.

Q.      Okay.  Did he say who he was being paid by?

A.      He just said that Billy Jack was being investigated for doing – claiming union pay when he wasn't doing union business.

Q.      That's all he said?

A.      That's all I heard.

(Harris Dep. at 27-32).

        For his part, Perry was asked in his deposition whether he had ever investigate[d the plaintiff] for loss time or loss work," to which he replied that, in his capacity as Trustee of the Local, he participated in an audit of the plaintiff.  (Deposition of Danny Perry[53] ("Perry Dep.") at 17-18).  He also admits that during such audit, he never found that the plaintiff had done anything wrong and that no charges were ever filed against him.  (*Id.* at 18).  However, Perry

_____

[53]The deposition of Danny Perry is Exh. 4 to Dft. Perry Evid. Sub.

denies even knowing Reynolds or Harris, and Perry further denies that he told anybody in the plant that the plaintiff had been suspended for stealing money. (*Id.* at 15-17).

In order to make out a prima facie case of defamation under Alabama law, a plaintiff has the burden at trial to establish the following elements: "[1] that the defendant was at least negligent, [2] in publishing [3] a false and defamatory statement to another [4] concerning the plaintiff, [5] which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod)." *Delta Health Group, Inc. v. Stafford*, 887 So. 2d 887, 895 (Ala. 2004) (quoting *Nelson v. Lapeyrouse Grain Corp.*, 534 So. 2d 1085, 1091 (Ala. 1988)).

The parties dispute whether, in addition to such state-law elements, the plaintiff's claims are subject under federal law to the "actual malice" standard of *New York Times v. Sullivan*, 376 U.S. 254 (1964), whereby a plaintiff must show by "clear and convincing proof," *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974), that a defamatory statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 280. Under the actual malice standard, "the plaintiff must demonstrate that the author in fact entertained serious doubts as to the truth of his publication or acted with a high degree of awareness of probable falsity." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) (citations and internal quotation marks omitted). This "actual malice" standard applies when a "defamatory publication is made in a context where the policies of the federal labor laws leading to protection for freedom of speech are significantly implicated." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 279 (1974); *see also Linn v. United Plant Guard Workers of Amer., Local 114*, 383 U.S. 53 (1966). This includes statements

84

"published in the context of a labor dispute," *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1191-92 (11th Cir. 1999), and "statements made during union representation election campaigns," and "during the course of union organizing efforts." *Old Dominion*, 418 U.S. at 279. The "actual malice" standard also applies where the plaintiff is a "public figure" or a "limited public figure" and the alleged defamatory publication involved an issue of public concern. *Meisler v. Gannett Co.*, 12 F.3d 1026, 1029 (11th Cir. 1994) (citing *Gertz*, 418 U.S. at 342-45). Elected union officials are generally held to be limited public figures for purposes of union business where their position is one of prominence or where there activities place them in a controversy that invites scrutiny. *See Cox v. Galazin*, 460 F. Supp. 2d 380, 389 (D. Conn. 2006); *see also Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 724 (5th Cir. 1980) (Secretary-Treasurer of the International Brotherhood of Teamsters was a public figures as relating to his official duties); *Guam Federation of Teachers., Local 1581 v. Ysrael*, 492 F.2d 438, 439 (9th Cir. 1974) (officers of teachers' union were public figures)*; Argentine v. United Steel Workers Ass'n*, 23 F. Supp. 2d 808, 820 (S.D. Ohio 1998) (plaintiffs were limited public figures because they were "chief union officers of a large local union which had recently experienced extended media coverage"); *Henry v. National Ass'n of Air Traffic Specialists, Inc.*, 836 F. Supp. 1204, 1211 n. 6 (D. Md. 1993) (union officials were "public figures" "[g]iven their prominence as elected and appointed leaders of a 1700-member union").

The plaintiff contends that the actual malice standard is inapplicable because Perry's statements were not made in the context of a true "labor dispute" or "union organizing campaign," so *Old Dominion* and *Linn*, the plaintiff says, are not controlling. However, as quoted above, *Old Dominion* suggests that the actual malice standard is applicable more broadly

85

to statements that materially implicate protection for freedom of speech flowing from federal

labor policies.  *See also Sullivan v. Conway*, 157 F.3d 1092, 1099 (7th Cir. 1998) ("Federal labor

law preempts state defamation law when applied in ways that interfere with the internal

management of unions." (citing *Old Dominion* and *Linn*)).  Thus, the principles of *Linn* may

apply to other "sort[s] of intra-union political dispute[s]," as where statements are made in

"vying for the good opinion (and votes) of the union membership."  *Cox,* 460 F. Supp. 2d at 393

(citation and internal quotation marks omitted); *accord Kirk v. Transport Workers Union of*

*Amer., AFL-CIO*, 934 F. Supp. 775, 787-789 (S.D. Tex. 1995) (concluding that "federal policies

favoring uninhibited, robust, and wide open debate in labor dispute are applicable" to speech

made by quasi-union officers that was critical of their political opponents within the local union).

Moreover, the plaintiff has not offered any argument in opposition to Perry's claim that the

plaintiff is a limited public figure.  Indeed, it is undisputed that the plaintiff was an elected

official of a relatively large local labor union and that all of Perry's statements in question relate

to the plaintiff's activities in that official capacity, including his alleged misuse of union funds.

As such, the court concludes that the "actual malice" standard applies to the plaintiff's

defamation claims, either under the principles of *Old Dominion* and *Linn,* under the "limited

public figure" doctrine, or both.

Perry argues that his alleged statements to Leach, to the effect that he, *i.e.*, Perry, believed

the plaintiff was a "racist" and a "radical" because he thought that the plaintiff would "only stand

up for" other African-Americans in performing his duties on the Grievance Committee, are not

actionable as defamation.  The court agrees.  "The First Amendment . . . protects mere rhetorical

hyperbole or statements that cannot reasonably be interpreted as representing actual facts."

86

*Finebaum v. Coulter*, 854 So. 2d 1120, 1125 (Ala. 2003) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990); *Old Dominion*, 418 U.S. at 284-86; *Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 14 (1970); *Harris v. School Annual Publ'g Co.*, 466 So. 2d 963, 965 (Ala. 1985)); *see also Horsley v. Feldt*, 304 F.3d 1125, 1131-32 (11th Cir. 2002); *Church of Scientology of California v. Cazares*, 638 F.2d 1272, 1288 (5th Cir. March 1981). Perry's statements to Leach amount merely to non-fact-based name-calling and rhetoric and do not sufficiently assert representations of actual facts. *See Stevens v. Tillman*, 855 F.2d 394, 401-02 (7th Cir. 1988) (action of PTA president in calling elementary school principal "racist" was not defamation under Illinois law, even though comment implied professional wrongdoing); *Smith v. School Dist. of Philadelphia*, 112 F. Supp. 2d 417, 429 (E.D. Pa. 2000) ("While . . . a statement that plaintiff is 'racist and anti-Semitic,' if it was made, would be unflattering, annoying and embarrassing, such a statement does not rise to the level of defamation as a matter of law because it is merely non-fact based rhetoric."); *Buckley v. Littell*, 539 F.2d 882, 891-95 (2d Cir. 1976) (the word "fascist" is "loose" and "ambigu[ous]" and cannot be regarded as a statement of fact because of the "tremendous imprecision" of meaning and usage of the term); *Raible v. Newsweek*, 341 F. Supp. 804, 807 (W.D. Pa. 1972) ("to call a person a bigot or other appropriate name descriptive of his political, racial, religious, economic or sociological philosophies gives no rise to an action for libel"). Accordingly, Perry is entitled to summary judgment on the defamation claims arising from these statements.

Perry argues that he is also entitled to summary judgment insofar as the plaintiff's defamation claims are based upon Leach's testimony alleging that Perry and Taylor told him that they "suspected" that the plaintiff "was misusing union funds . . . by taking off on [u]nion

business too often and using up [u]nion funds." Perry similarly contends that the plaintiff's

defamation claims are subject to dismissal to the extent that they are based upon Harris's

testimony that Perry alleged that the plaintiff was being "audited" or "investigated" for

submitting voucher claims and being paid by the union for activities that did not actually involve

union business. Perry contends that the record establishes that these statements were true

because the plaintiff was, in fact, audited during that period by union officials to review the

validity of his claims for payment and reimbursement that he had submitted to the union for his

official activities. "Truth is an absolute defense to a defamation claim." *S.B. v. Saint James

School*, 959 So. 2d 72, 100 (Ala. 2006). At the very least, Perry contends, the evidence does not

support that the statements were made with actual malice. The court agrees. The plaintiff does

not dispute that he was audited. Rather, he suggests that he was audited for an illegitimate,

retaliatory purpose, based on the fact that he had allegedly reported to the International that

Carden had called another member a racial epithet. Nonetheless, the fact remains that the

plaintiff was audited in substantially the manner that Perry is reported to have stated, to

determine the validity of his claims for lost time submitted to the union. Even if representations

may have been exaggerated or even false, the evidence does not support that these statements

were made with actual malice. *See Westfall v. GTE North, Inc.*, 956 F. Supp. 707, 716 (N.D.

Tex. 1996). The court concludes, therefore, that Perry is entitled to summary judgment on the

claims founded upon the statements made to Leach and Harris alleging respectively that the

plaintiff was "suspected" of, or "audited" or "investigated for" misuse or misappropriation of

union funds.

     The plaintiff argues, however, that Perry went beyond alleging merely that the plaintiff

was "suspected" of, or being "investigated" for, misusing union funds.  Rather, he says that Perry affirmatively asserted that "the plaintiff was stealing and/or misappropriating funds by submitting false lost time vouchers [t]o the Union" and that Perry was personally aware of such wrongdoing as a result of an audit that Perry himself had conducted.  ("Memorandum in Support of Plaintiff's Opposition to the Motion of (sic) Summary Judgment of Danny Perry"[54] ("Pl. Brief in Opp. to Perry's Summ. J. Mot.") at 11).  Indeed, the court agrees that this is a fair interpretation of the excerpt of Reynolds's deposition testimony set forth above.  Perry contends that the evidence fails to suggest that any of his attributed statements, even if false, were made with actual malice.  However, the court concludes that the record, viewed in the light most favorable to the plaintiff, is sufficient to create a jury question on that issue with regard to these statements.  Reynolds testifies that Perry stated that he, Perry, had participated in an audit revealing that the plaintiff, as well as other unspecified officials of the Local, had been reimbursed out of union funds based upon their submission of lost time vouchers that falsely claimed time spent on union business.  Although Perry denies having made such statements, Reynolds's contrary testimony must be credited on summary judgment.  Further, the evidence is undisputed that Perry personally participated the audit of the claims submitted by the plaintiff to the union for lost time and that Perry was actually aware that such audit did not show that the plaintiff was guilty of any wrongdoing and that no charges were ever filed against him.  In such circumstances, the court concludes, a jury could reasonably find by clear and convincing proof that Perry entertained serious doubts as to the truth of his publication or acted with a high degree of awareness of probable falsity, as required to show actual malice.  *See Kirk*, 934 F. Supp. at

---

[54]The plaintiff's brief in opposition to Perry's motion for summary judgment is doc. 52.

789-90 (evidence of actual malice sufficient to survive summary judgment on defamation claims founded on statements alleging, among other things, that plaintiff union officials had used union funds "for non-union business and personal pleasures"); *also see generally Hammer v. Slater*, 20 F.3d 1137, 1143 (11th Cir. 1994); *Hunt v. Liberty Lobby*, 720 F.2d 631, 645 (11th Cir. 1983) (both holding that evidence was sufficient to allow a finding of publication made with actual malice).

Perry also argues, however, that he is still entitled to summary judgment because the plaintiff cannot establish that he suffered any damage as a proximate result of the alleged publication. The plaintiff responds that Perry's statements accusing him of misappropriating union funds based upon receipt of reimbursement payments prompted by the plaintiff's submission of false time loss vouchers is in essence an allegation of larceny or theft that gives rise to presumed damages for slander per se. The plaintiff also contends that he can prove special damages. Perry has replied by disputing the plaintiff's claim of special damages, although Perry has not responded to the plaintiff's argument that Perry made statements that are defamatory per se.

The Alabama Supreme Court has explained:

As the final element of a defamation claim, a plaintiff must establish damage. Damage is implied by law when spoken words are found to be slander *per se*. *Anderton v. Gentry*, 577 So. 2d 1261 (Ala. 1991); *Sunshine Invs., Inc. v. Brooks*, 642 So. 2d 408, 410 (Ala. 1994).

" '[T]o constitute slander actionable per se, there must be an imputation of an indictable offense involving infamy or moral turpitude....

" 'This distinction, however, does not deny the right to maintain an action for slander founded on oral malicious defamation subjecting

90

> > the plaintiff to disgrace, ridicule, odium, or contempt, though it
> > falls short of imputing the commission of such crime or
> > misdemeanor.  In such case the law pronounces the words
> > actionable per quod only, and the plaintiff must allege and prove
> > special damages as an element of the cause of action.' "

> *Ceravolo v. Brown*, 364 So. 2d 1155, 1157 (Ala. 1978) (quoting *Marion v. Davis*,
> 217 Ala. 16, 18, 114 So. 357, 358-59 (1927)).  Once a communication is found to
> be slanderous per se, a plaintiff may recover nominal or compensatory damages
> without proof of actual harm to his reputation or proof of any other harm.  *See*
> *Nelson* [*v. Lapeyrouse Grain Corp.*, 534 So. 2d 1085, 1092 (Ala. 1988)] (quoting
> W. Prosser and W. Keeton, The Law of Torts § 112, at 788 (5th ed. 1984)).

*Delta Health Group, Inc. v. Stafford*, 887 So. 2d 887, 896-97 (Ala. 2004).  *See also Shook v. St.*

*Bede School*, 74 F. Supp. 2d 1172, 1180 (M.D. Ala. 1999); *Ledbetter v. United Ins. Co. of Amer.*,

845 F. Supp. 844, 846-47 (M.D. Ala. 1994).

In analyzing whether a statement constitutes slander per se, the Alabama Supreme Court

has said:

> > When determining whether a statement is actionable as slander *per se*, a
> > court must give the language used "that meaning that would be ascribed to the
> > language by a reader or listener of 'average or ordinary intelligence, or by a
> > common mind.' "  *Camp v. Yeager,* 601 So. 2d 924, 927 (Ala. 1992), quoting
> > *Loveless v. Graddick,* 295 Ala. 142, 148, 325 So. 2d 137, 142 (1975).  Moreover,
> > this Court has stated: "'When words from their general import appear to have
> > been spoken with a view to defame a party, the court ought not to be industrious
> > in putting a construction upon them different from what they bear in the common
> > acceptation and meaning of them.' "  *Johnston v. Turner,* 159 Ala. 356, 358, 47
> > So. 570, 571 (1908), quoting *Wofford v. Meeks,* 129 Ala. 349, 357, 30 So. 625,
> > 627 (1901).  Stated differently, the courts will not apply a forced construction in
> > order to render the statement nondefamatory and thereby to relieve the defendant
> > of liability.  *Marion v. Davis,* 217 Ala. at 19, 114 So. at 359. Finally, the alleged
> > slanderous statement must be construed in connection with the other parts of the
> > conversation, in order to determine the context in which the statement was made.
> > *Marion, supra.*

*Liberty Nat. Life Ins. Co. v. Daugherty*, 840 So. 2d 152, 157-58 (Ala. 2002).  *See also Cottrell v.*

*National Collegiate Athletic Ass'n*, 975 So. 2d 306, 345-46 (Ala. 2007).  "[L]arceny falls within

the definition of an indictable criminal offense involving infamy or moral turpitude and that, therefore, words that impute the offense of larceny are slanderous *per se*." *Id.*, 840 So. 2d at 158. The Alabama Supreme Court has suggested more broadly that words that impute commission of any "theft" within the meaning of Alabama's unified theft offense statute, which encompasses the prior offenses of larceny, embezzlement, and theft by deception, *see* Ala. Code 1975 §§ 13A-8-2 through 13A-8-5, are slanderous per se. *See Daugherty*, 840 So. 2d at 158-160; *see also Johnston v. Turner*, 47 So. 570 (Ala. 1908) (holding words alleging that the plaintiff had destroyed a public record belonging to the mayor's office to cover up evidence of his misappropriation of public funds and fines belonging to the town were slander per se); *cf. Iron Age Pub. Co. v. Crudup*, 5 So. 332, 333 (Ala. 1889) (statement alleging that a clerk had converted to his own use or fraudulently secreted with intent to convert money coming into his possession by virtue of his employment would import commission of the offense of embezzlement and would be libelous per se); *Chong v. Reebaa Const., Inc.*, 645 S.E.2d 47, 53 (Ga. App. 2007) (defendant's statement that the plaintiff "was a 'crook' constituted slander *per se*, since it could be understood as charged [the plaintiff] with guilt of the crime of theft by deception, also known as cheating and swindling"), *rev'd on other grounds*, 657 S.E.2d 826 (Ga. 2008)).

Here, the evidence supports that Perry stated to Reynolds that he, Perry, had performed an audit that disclosed that the plaintiff and other, un-named officials of the Local "were basically robbing" the union by receiving reimbursement from the union based on vouchers claiming that they were "taking off work on union business" notwithstanding that they actually "[were not] conducting union business." The court agrees with the plaintiff that such an allegation imputes a

violation of the Alabama unified theft statute.  *See, e.g., Fitch v. State*, 851 So. 2d 103, 121-22

(Ala. Crim. App. 2001) (evidence supported a finding that conduct of defendant county

commissioner in connection with closing of landfill established theft by deception; evidence

indicated that defendant took certain deceptive actions to facilitate receiving county funds);

*Lipham v. State*, 616 So. 2d 396 (Ala. Crim. App. 1993) (corporate bookkeeper committed theft

where she wrote company checks to pay personal debts and for personal items without

authorization); *Britain v. State*, 533 So. 2d 684 (Ala. Crim. App. 1988) (evidence that defendant

caused false invoices for repairs to equipment at state docks to be submitted to, and paid by state

docks department for services rendered on property belonging to defendant, was sufficient to

support conviction for theft by deception).  As such, the court concludes that the statements in

question are capable of constituting slander per se, precluding summary judgment on the ground

that the plaintiff cannot establish the element of damages.[55]

## V.    CONCLUSION

Based on the foregoing the court concludes that the defendants' respective motions for

summary judgment are each due to be **GRANTED IN PART AND DENIED IN PART**.  The

union defendants' motion (doc. 36) is due to be **GRANTED** insofar as it seeks **DISMISSAL** of

the following:

> (1)    the claims against both the Local and the International under Title
>         IV of the LMRDA for lack of subject-matter jurisdiction;
>
> (2)    all other claims against and the International;
>
> (3)    the Title VII and the § 1981 retaliation claims against the Local;

---

[55]Because the court concludes that damages may be presumed this claim, the court need not address the parties'
arguments regarding the sufficiency of the evidence pertaining to special damages.

    (4)     the "equal rights" claims against the Local under § 101(a)(1) of Title I of the LMRDA;

    (5)     the improper "discipline" claims against the Local under § 101(a)(5) of Title I and § 609 of Title VI of the LMRDA;

    (6)     the claim against the Local for breach of the duty of fair representation; and,

    (7)     all the defamation claims against the Local.

Defendant Perry's motion (doc. 39) is due to be **GRANTED** insofar as it seeks the dismissal of the following:

    (1)     the claims under Title IV of the LMRDA for lack of subject matter jurisdiction;

    (2)     all the Title VII claims;

    (3)     the § 1981 retaliation claim;

    (4)     the "equal rights" claims under § 101(a)(1) of Title I of the LMRDA;

    (5)     the improper "discipline" claims under § 101(a)(5) of Title I and § 609 of Title VI of the LMRDA;

    (6)     the claims alleging breach of the duty of fair representation;

    (7)     the claims alleging breach of the union constitution or bylaws under § 301 of the LMRA; and,

    (8)     the state-law defamation claims premised upon allegations that the plaintiff was a "racist" and a "radical" and that he was "suspected of" or "being investigated for" wrongfully claiming and accepting union lost time payments.

The motion filed by Defendants Evans and Irwin (doc. 42) is due to be **GRANTED** insofar as it seeks dismissal of the following claims:

    (1)     the claims under Title IV of the LMRDA for lack of subject matter jurisdiction;

    (2)     all the Title VII claims;

    (3)     the § 1981 retaliation claim;

(4)     the "equal rights" claims under § 101(a)(1) of Title I of the LMRDA;

(5)     the improper "discipline" claims under § 101(a)(5) of Title I and § 609 of Title VI of the LMRDA;

(6)     the claims alleging breach of the duty of fair representation;

(7)     the claims alleging breach of the union constitution or bylaws under § 301 of the LMRA; and,

(8)     all the defamation claims.

The claims against District 9 are also due to be dismissed for the reasons articulated concerning the International.

The foregoing dismissals would, the court assesses, leave remaining as potentially viable the following claims:

(1)     the Title VII claims for race discrimination against the Local based upon the plaintiff's removal from office in August 2006;

(2)     the § 1981 claims for race discrimination against the Local, Evans, Irwin, and Perry, also based upon the plaintiff's removal from office in August 2006;

(3)     "free speech" claims under § 101(a)(2) of Title I of the LMRDA against the Local, Evans, Irwin, and Perry based upon the plaintiff's removal from office in August 2006;

(4)     a claim under § 301 of the LMRA against the Local for breach of contract based upon his removal from office in August 2006; and,

(5)     a claim for slander under Alabama law against Perry based upon alleged statements that a union investigation had revealed that the plaintiff was guilty of wrongfully claiming and accepting union lost time payments.

An appropriate order in accord with the foregoing will be entered.

95

**DONE** this 23rd day of February, 2009.

_John E. Ott_

**JOHN E. OTT**
United States Magistrate Judge